# PICKERING *v.* BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT 205, WILL COUNTY.

No. 510.  Argued March 27, 1968.—Decided June 3, 1968.

*John Ligtenberg* argued the cause for appellant. With him on the briefs was *Andrew J. Leahy.*

*John F. Cirricione* argued the cause and filed a brief for appellee.

*Milton I. Shadur* filed a brief for the American Civil Liberties Union, Illinois Division, as *amicus curiae,* urging reversal.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Appellant Marvin L. Pickering, a teacher in Township High School District 205, Will County, Illinois, was dismissed from his position by the appellee Board of Education for sending a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools. Appellant's dismissal resulted from a determination by the Board, after a full hearing, that the publication of the letter was "detrimental to the efficient operation and administration of the schools of the district" and hence, under the rele-

vant Illinois statute, Ill. Rev. Stat., c. 122, § 10–22.4 (1963), that "interests of the school require[d] [his dismissal]."

Appellant's claim that his writing of the letter was protected by the First and Fourteenth Amendments was rejected. Appellant then sought review of the Board's action in the Circuit Court of Will County, which affirmed his dismissal on the ground that the determination that appellant's letter was detrimental to the interests of the school system was supported by substantial evidence and that the interests of the schools overrode appellant's First Amendment rights. On appeal, the Supreme Court of Illinois, two Justices dissenting, affirmed the judgment of the Circuit Court. 36 Ill. 2d 568, 225 N. E. 2d 1 (1967). We noted probable jurisdiction of appellant's claim that the Illinois statute permitting his dismissal on the facts of this case was unconstitutional as applied under the First and Fourteenth Amendments.[1] 389 U. S. 925 (1967). For the reasons detailed below we agree that appellant's rights to freedom of speech were violated and we reverse.

## I.

In February of 1961 the appellee Board of Education asked the voters of the school district to approve a bond issue to raise $4,875,000 to erect two new schools. The proposal was defeated. Then, in December of 1961, the Board submitted another bond proposal to the voters which called for the raising of $5,500,000 to build two new schools. This second proposal passed and the schools were built with the money raised by the bond

---

[1] Appellant also challenged the statutory standard on which the Board based his dismissal as vague and overbroad. See *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *NAACP* v. *Button,* 371 U. S. 415 (1963); *Shelton* v. *Tucker,* 364 U. S. 479 (1960). Because of our disposition of this case we do not reach appellant's challenge to the statute on its face.

sales. In May of 1964 a proposed increase in the tax rate to be used for educational purposes was submitted to the voters by the Board and was defeated. Finally, on September 19, 1964, a second proposal to increase the tax rate was submitted by the Board and was likewise defeated. It was in connection with this last proposal of the School Board that appellant wrote the letter to the editor (which we reproduce in an Appendix to this opinion) that resulted in his dismissal.

Prior to the vote on the second tax increase proposal a variety of articles attributed to the District 205 Teachers' Organization appeared in the local paper. These articles urged passage of the tax increase and stated that failure to pass the increase would result in a decline in the quality of education afforded children in the district's schools. A letter from the superintendent of schools making the same point was published in the paper two days before the election and submitted to the voters in mimeographed form the following day. It was in response to the foregoing material, together with the failure of the tax increase to pass, that appellant submitted the letter in question to the editor of the local paper.

The letter constituted, basically, an attack on the School Board's handling of the 1961 bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. It also charged the superintendent of schools with attempting to prevent teachers in the district from opposing or criticizing the proposed bond issue.

The Board dismissed Pickering for writing and publishing the letter. Pursuant to Illinois law, the Board was then required to hold a hearing on the dismissal. At the hearing the Board charged that numerous statements in the letter were false and that the publication

of the statements unjustifiably impugned the "motives, honesty, integrity, truthfulness, responsibility and competence" of both the Board and the school administration. The Board also charged that the false statements damaged the professional reputations of its members and of the school administrators, would be disruptive of faculty discipline, and would tend to foment "controversy, conflict and dissension" among teachers, administrators, the Board of Education, and the residents of the district. Testimony was introduced from a variety of witnesses on the truth or falsity of the particular statements in the letter with which the Board took issue. The Board found the statements to be false as charged. No evidence was introduced at any point in the proceedings as to the effect of the publication of the letter on the community as a whole or on the administration of the school system in particular, and no specific findings along these lines were made.

The Illinois courts reviewed the proceedings solely to determine whether the Board's findings were supported by substantial evidence and whether, on the facts as found, the Board could reasonably conclude that appellant's publication of the letter was "detrimental to the best interests of the schools." Pickering's claim that his letter was protected by the First Amendment was rejected on the ground that his acceptance of a teaching position in the public schools obliged him to refrain from making statements about the operation of the schools "which in the absence of such position he would have an undoubted right to engage in." It is not altogether clear whether the Illinois Supreme Court held that the First Amendment had no applicability to appellant's dismissal for writing the letter in question or whether it determined that the particular statements made in the letter were not entitled to First Amendment protection.

In any event, it clearly rejected Pickering's claim that, on the facts of this case, he could not constitutionally be dismissed from his teaching position.

## II.

To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. *E. g., Wieman* v. *Updegraff,* 344 U. S. 183 (1952); *Shelton* v. *Tucker,* 364 U. S. 479 (1960); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967). "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian* v. *Board of Regents, supra,* at 605–606. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

## III.

The Board contends that "the teacher by virtue of his public employment has a duty of loyalty to support his superiors in attaining the generally accepted goals of education and that, if he must speak out publicly, he should do so factually and accurately, commensurate with

his education and experience." Appellant, on the other hand, argues that the test applicable to defamatory statements directed against public officials by persons having no occupational relationship with them, namely, that statements to be legally actionable must be made "with knowledge that [they were] . . . false or with reckless disregard of whether [they were] . . . false or not," *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 280 (1964), should also be applied to public statements made by teachers. Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run.

An examination of the statements in appellant's letter objected to by the Board [2] reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. The statements are in no way directed towards any person with whom appellant would normally be in

---

[2] We have set out in the Appendix our detailed analysis of the specific statements in appellant's letter which the Board found to be false, together with our reasons for concluding that several of the statements were, contrary to the findings of the Board, substantially correct.

contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct, such as statements (1)–(4) of appellant's letter, see Appendix, *infra,* may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.[3]

We next consider the statements in appellant's letter which we agree to be false. The Board's original charges included allegations that the publication of the letter damaged the professional reputations of the Board and the superintendent and would foment controversy and conflict among the Board, teachers, administrators, and the residents of the district. However, no evidence to support these allegations was introduced at the hearing. So far as the record reveals, Pickering's letter was greeted by everyone but its main target, the Board, with massive apathy and total disbelief. The Board must, therefore,

---

[3] It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

have decided, perhaps by analogy with the law of libel, that the statements were *per se* harmful to the operation of the schools.

However, the only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were *per se* detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. Certainly an accusation that too much money is being spent on athletics by the administrators of the school system (which is precisely the import of that portion of appellant's letter containing the statements that we have found to be false, see Appendix, *infra*) cannot reasonably be regarded as *per se* detrimental to the district's schools. Such an accusation reflects rather a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest.

In addition, the fact that particular illustrations of the Board's claimed undesirable emphasis on athletic programs are false would not normally have any necessary impact on the actual operation of the schools, beyond its tendency to anger the Board. For example, Pickering's letter was written after the defeat at the polls of the second proposed tax increase. It could, therefore, have had no effect on the ability of the school district to raise necessary revenue, since there was no showing that there was any proposal to increase taxes pending when the letter was written.

More importantly, the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open

debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

In addition, the amounts expended on athletics which Pickering reported erroneously were matters of public record on which his position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer. The Board could easily have rebutted appellant's errors by publishing the accurate figures itself, either via a letter to the same newspaper or otherwise. We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a teacher make substantial efforts to verify the accuracy of his charges before publishing them.[4]

What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in

---

[4] There is likewise no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public.

the classroom [5] or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

## IV.

The public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment—is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity. *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *St. Amant* v. *Thompson,* 390 U. S. 727 (1968). Compare *Linn* v. *United Plant Guard Workers,* 383 U. S. 53 (1966). The same test has been applied to suits for invasion of privacy based on false statements where a "matter of public interest" is involved. *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967). It is therefore perfectly clear that, were appellant a member of the general public, the State's power to afford the appellee Board of Education or its members any legal right to sue him for writing the letter at issue here would be limited by the requirement that the letter be judged by the standard laid down in *New York Times.*

---

[5] We also note that this case does not present a situation in which a teacher's public statements are so without foundation as to call into question his fitness to perform his duties in the classroom. In such a case, of course, the statements would merely be evidence of the teacher's general competence, or lack thereof, and not an independent basis for dismissal.

This Court has also indicated, in more general terms, that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors. *Garrison* v. *Louisiana,* 379 U. S. 64 (1964); *Wood* v. *Georgia,* 370 U. S. 375 (1962). In *Garrison,* the *New York Times* test was specifically applied to a case involving a criminal defamation conviction stemming from statements made by a district attorney about the judges before whom he regularly appeared.

While criminal sanctions and damage awards have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech. We have already noted our disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism. However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be.

In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him,[6] a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. Since no

---

[6] Because we conclude that appellant's statements were not knowingly or recklessly false, we have no occasion to pass upon the additional question whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any harmful effects, still be protected by the First Amendment. See also n. 5, *supra.*

such showing has been made in this case regarding appellant's letter, see Appendix, *infra*, his dismissal for writing it cannot be upheld and the judgment of the Illinois Supreme Court must, accordingly, be reversed and the case remanded for further proceedings not inconsistent with this opinion.                    *It is so ordered.*

Mr. Justice Douglas, with whom Mr. Justice Black joins, concurs in the judgment of the Court for the reasons set out in his concurring opinions in *Time, Inc.* v. *Hill*, 385 U. S. 374, 401, *Rosenblatt* v. *Baer*, 383 U. S. 75, 88, and *Garrison* v. *Louisiana*, 379 U. S. 64, 80, and in the separate opinions of Mr. Justice Black in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 170, and *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 293.

APPENDIX TO OPINION OF THE COURT.

A. *Appellant's letter.*

LETTERS TO THE EDITOR

\*\*\*\* Graphic Newspapers, Inc.

Thursday, September 24, 1964, Page 4

Dear Editor:

I enjoyed reading the back issues of your paper which you loaned to me. Perhaps others would enjoy reading them in order to see just how far the two new high schools have deviated from the original promises by the Board of Education. First, let me state that I am referring to the February thru November, 1961 issues of your paper, so that it can be checked.

One statement in your paper declared that swimming pools, athletic fields, and auditoriums had been left out of the program. They may have been left out but they got put back in very quickly because Lockport West has both an auditorium and athletic field. In fact, Lockport West has a better athletic field than Lockport Central. It has a track that isn't quite regulation distance even

576

though the board spent a few thousand dollars on it. Whose fault is that? Oh, I forgot, it wasn't supposed to be there in the first place. It must have fallen out of the sky. Such responsibility has been touched on in other letters but it seems one just can't help noticing it. I am not saying the school shouldn't have these facilities, because I think they should, but promises are promises, or are they?

Since there seems to be a problem getting all the facts to the voter on the twice defeated bond issue, many letters have been written to this paper and probably more will follow, I feel I must say something about the letters and their writers. Many of these letters did not give the whole story. Letters by your Board and Administration have stated that teachers' salaries total $1,297,746 for one year. Now that must have been the total payroll, otherwise the teachers would be getting $10,000 a year. I teach at the high school and I know this just isn't the case. However, this shows their "stop at nothing" attitude. To illustrate further, do you know that the superintendent told the teachers, and I quote, "Any teacher that opposes the referendum should be prepared for the consequences." I think this gets at the reason we have problems passing bond issues. Threats take something away; these are insults to voters in a free society. We should try to sell a program on its merits, if it has any.

Remember those letters entitled "District 205 Teachers Speak," I think the voters should know that those letters have been written and agreed to by only five or six teachers, not 98% of the teachers in the high school. In fact, many teachers didn't even know who was writing them. Did you know that those letters had to have the approval of the superintendent before they could be put in the paper? That's the kind of totalitarianism teach-

ers live in at the high school, and your children go to school in.

In last week's paper, the letter written by a few uninformed teachers threatened to close the school cafeteria and fire its personnel. This is ridiculous and insults the intelligence of the voter because properly managed school cafeterias do not cost the school district any money. If the cafeteria is losing money, then the board should not be packing free lunches for athletes on days of athletic contests. Whatever the case, the taxpayer's child should only have to pay about 30¢ for his lunch instead of 35¢ to pay for free lunches for the athletes.

In a reply to this letter your Board of Administration will probably state that these lunches are paid for from receipts from the games. But $20,000 in receipts doesn't pay for the $200,000 a year they have been spending on varsity sports while neglecting the wants of teachers.

You see we don't need an increase in the transportation tax unless the voters want to keep paying $50,000 or more a year to transport athletes home after practice and to away games, etc. Rest of the $200,000 is made up in coaches' salaries, athletic directors' salaries, baseball pitching machines, sodded football fields, and thousands of dollars for other sports equipment.

These things are all right, provided we have enough money for them. To sod football fields on borrowed money and then not be able to pay teachers' salaries is getting the cart before the horse.

If these things aren't enough for you, look at East High. No doors on many of the classrooms, a plant room without any sunlight, no water in a first aid treatment room, are just a few of many things. The taxpayers were really taken to the cleaners. A part of the sidewalk in front of the building has already collapsed. Maybe Mr. Hess would be interested to know that we need blinds on the windows in that building also.

Once again, the board must have forgotten they were going to spend $3,200,000 on the West building and $2,300,000 on the East building.

As I see it, the bond issue is a fight between the Board of Education that is trying to push tax-supported athletics down our throats with education, and a public that has mixed emotions about both of these items because they feel they are already paying enough taxes, and simply don't know whom to trust with any more tax money.

I must sign this letter as a citizen, taxpayer and voter, not as a teacher, since that freedom has been taken from the teachers by the administration. Do you really know what goes on behind those stone walls at the high school?

Respectfully,

Marvin L. Pickering.

### B. *Analysis.*

The foregoing letter contains eight principal statements which the Board found to be false.[1] Our independent review of the record [2] convinces us that Justice

---

[1] We shall not bother to enumerate some of the statements which the Board found to be false because their triviality is so readily apparent that the Board could not rationally have considered them as detrimental to the interests of the schools regardless of their truth or falsity.

[2] This Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case. *E. g., Norris* v. *Alabama,* 294 U. S. 587 (1935); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 285 (1964). However, even in cases where the upholding or rejection of a constitutional claim turns on the resolution of factual questions, we also consistently give great, if not controlling, weight to the findings of the state courts. In the present case the trier of fact was the same body that was also both the victim of appellant's statements and the

Schaefer was correct in his dissenting opinion in this case when he concluded that many of appellant's statements which were found by the Board to be false were in fact substantially correct. We shall deal with each of the statements found to be false in turn. (1) Appellant asserted in his letter that the two new high schools when constructed deviated substantially from the original promises made by the Board during the campaign on the bond issue about the facilities they would contain. The Board based its conclusion that this statement was false on its determination that the promises referred to were those made in the campaign to pass the second bond issue in December of 1961. In the campaign on the first bond issue the Board stated that the plans for the two schools did not include such items as swimming pools, auditoriums, and athletic fields. The publicity put out by the Board on the second bond issue mentioned nothing about the addition of an auditorium to the plans and also mentioned nothing specific about

prosecutor that brought the charges aimed at securing his dismissal. The state courts made no independent review of the record but simply contented themselves with ascertaining, in accordance with statute, whether there was substantial evidence to support the Board's findings.

Appellant requests us to reverse the state courts' decisions upholding his dismissal on the independent ground that the procedure followed above deprived him of due process in that he was not afforded an impartial tribunal. However, appellant makes this contention for the first time in this Court, not having raised it at any point in the state proceedings. Because of this, we decline to treat appellant's claim as an independent ground for our decision in this case. On the other hand, we do not propose to blind ourselves to the obvious defects in the fact-finding process occasioned by the Board's multiple functioning *vis-à-vis* appellant. Compare *Tumey* v. *Ohio,* 273 U. S. 510 (1927); *In re Murchison,* 349 U. S. 133 (1955). Accordingly, since the state courts have at no time given *de novo* consideration to the statements in the letter, we feel free to examine the evidence in this case completely independently and to afford little weight to the factual determinations made by the Board.

athletic fields, although a general reference to "state required physical education" facilities was included that was similar to a reference made in the material issued by the Board during the first campaign.

In sum, the Board first stated that certain facilities were not to be included in the new high schools as an economy measure, changed its mind after the defeat of the first bond issue and decided to include some of the facilities previously omitted, and never specifically or even generally indicated to the taxpayers the change. Appellant's claim that the original plans, as disclosed to the public, deviated from the buildings actually constructed is thus substantially correct and his characterization of the Board's prior statement as a "promise" is fair as a matter of opinion. The Board's conclusion to the contrary based on its determination that appellant's statement referred only to the literature distributed during the second bond issue campaign is unreasonable in that it ignores the word "original" that modifies "promises" in appellant's letter.

(2) Appellant stated that the Board incorrectly informed the public that "teachers' salaries" total $1,297,746 per year. The Board found that statement false. However, the superintendent of schools admitted that the only way the Board's figure could be regarded as accurate was to change the word "teachers" to "instructional" whereby the salaries of deans, principals, librarians, counselors, and four secretaries at each of the district's three high schools would be included in the total. Appellant's characterization of the Board's figure as incorrect is thus clearly accurate.

(3) Pickering claimed that the superintendent had said that any teacher who did not support the 1961 bond issue referendum should be prepared for the consequences. The Board found this claim false. However, the statement was corroborated by the testimony of two other teachers, although the superintendent denied making the

remark attributed to him. The Illinois Supreme Court appears to have agreed that something along the lines stated by appellant was said, since it relied, in upholding the Board's finding that appellant's version of the remark was false, on testimony by one of the two teachers that he interpreted the remark to be a prediction about the adverse consequences for the schools should the referendum not pass rather than a threat against noncooperation by teachers. However, the other teacher testified that he didn't know how to interpret the remark. Accordingly, while appellant may have misinterpreted the meaning of the remark, he did not misreport it.

(4) Appellant's letter stated that letters from teachers to newspapers had to have the approval of the superintendent before they could be submitted for publication. The Board relied in finding this statement false on the testimony by the superintendent that no approval was required by him. However, the Handbook for Teachers of the district specifically stated at that time that material submitted to local papers should be checked with the building principal and submitted in triplicate to the publicity coordinator. In particular, the teachers' letters to which appellant was specifically referring in his own letter had in fact been submitted to the superintendent prior to their publication. Thus this statement is substantially correct.

The other four statements challenged by the Board, are factually incorrect in varying degrees. (5) Appellant's letter implied that providing athletes in the schools with free lunches meant that other students must pay 35¢ instead of 30¢ for their lunches. This statement is erroneous in that while discontinuing free lunches for athletes would have permitted some small decrease in the 35¢ charge for lunch to other students, the decrease would not have brought the price down to 30¢. (6) Appellant claimed that the Board had been spending $200,000 a year on athletics while neglecting the wants

of teachers. This claim is incorrect in that the $200,000 per year figure included over $130,000 of nonrecurring capital expenditures. (7) Appellant also claimed that the Board had been spending $50,000 a year on transportation for athletes. This claim is completely false in that the expenditures on travel for athletes per year were about $10,000. (8) Finally, appellant stated that football fields had been sodded on borrowed money, while the Board had been unable to pay teachers' salaries. This statement is substantially correct as to the football fields being sodded with borrowed money because the money spent was the proceeds of part of the bond issue, which can fairly be characterized as borrowed. It is incorrect insofar as it suggests that the district's teachers had actually not been paid upon occasion, but correct if taken to mean that the Board had at times some difficulty in obtaining the funds with which to pay teachers. The manner in which the last four statements are false is perfectly consistent with good-faith error, and there is no evidence in the record to show that anything other than carelessness or insufficient information was responsible for their being made.

MR. JUSTICE WHITE, concurring in part and dissenting in part.

The Court holds that truthful statements by a school teacher critical of the school board are within the ambit of the First Amendment. So also are false statements innocently or negligently made. The State may not fire the teacher for making either unless, as I gather it, there are special circumstances, not present in this case, demonstrating an overriding state interest, such as the need for confidentiality or the special obligations which a teacher in a particular position may owe to his superiors.[1]

---

[1] See *ante*, at 569–570, 572 and nn. 3, 4. The Court does not elaborate upon its suggestion that there may be situations in which, with

The core of today's decision is the holding that Pickering's discharge must be tested by the standard of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). To this extent I am in agreement.

The Court goes on, however, to reopen a question I had thought settled by *New York Times* and the cases that followed it, particularly *Garrison* v. *Louisiana,* 379 U. S. 64 (1964). The Court devotes several pages to re-examining the facts in order to reject the determination below that Pickering's statements harmed the school system, *ante,* at 570–573, when the question of harm is clearly irrelevant given the Court's determination that Pickering's statements were neither knowingly nor recklessly false and its ruling that in such circumstances a teacher may not be fired even if the statements are injurious. The Court then gratuitously suggests that when statements are found to be knowingly or recklessly false, it is an open question whether the First Amendment still protects them unless they are shown or can be presumed to have caused harm. *Ante,* at 574, n. 6. Deliberate or reckless falsehoods serve no First Amendment ends and deserve no protection under that Amendment. The Court unequivocally recognized this in *Garrison,* where after reargument the Court said that "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." 379 U. S., at 75. The Court today neither

---

reference to certain areas of public comment, a teacher may have special obligations to his superiors. It simply holds that in this case, with respect to the particular public comment made by Pickering, he is more like a member of the general public and, apparently, too remote from the school board to require placing him into any special category. Further, as I read the Court's opinion, it does not foreclose the possibility that under the First Amendment a school system may have an enforceable rule, applicable to teachers, that public statements about school business must first be submitted to the authorities to check for accuracy.

explains nor justifies its withdrawal from the firm stand taken in *Garrison*. As I see it, a teacher may be fired without violation of the First Amendment for knowingly or recklessly making false statements regardless of their harmful impact on the schools. As the Court holds, however, in the absence of special circumstances he may not be fired if his statements were true or only negligently false, even if there is some harm to the school system. I therefore see no basis or necessity for the Court's foray into fact-finding with respect to whether the record supports a finding as to injury.[2] If Pickering's false statements were either knowingly or recklessly made, injury to the school system becomes irrelevant, and the First Amendment would not prevent his discharge. For the State to be constitutionally precluded from terminating his employment, reliance on some other constitutional provision would be required.

Nor can I join the Court in its findings with regard to whether Pickering knowingly or recklessly published false statements. Neither the State in presenting its evidence nor the state tribunals in arriving at their findings and conclusions of law addressed themselves to the elements of the new standard which the Court holds the First Amendment to require in the circumstances of this case. Indeed, the state courts expressly rejected the applicability of both *New York Times* and *Garrison*. I find it wholly unsatisfactory for this Court to make the initial determination of knowing or reckless falsehood from the cold record now before us. It would be far more appropriate to remand this case to the state courts for further proceedings in light of the constitutional standard which the Court deems applicable to this case, once the relevant facts have been ascertained in appropriate proceedings.

---

[2] Even if consideration of harm were necessary in this case, I could not join the Court in concluding on this record that harm to the school administration was not proved and could not be presumed.