William J. HOOPES

v.

John H. NACRELLI, Individually and as Mayor of the City of Chester and President of the City Council of the City of Chester

Clinton L. Johnson, Michael D. Macneilly, Alexander V. Osowski, James L. Sharp, Each individually and as Councilmen of the City of Chester.

Civ. A. No. 79–1246.

United States District Court, E. D. Pennsylvania.

April 24, 1981.

Walter I. Breslin, Ridley Park, Pa., for plaintiff.

Arthur Levy, Media, Pa., for defendants.

### OPINION

LUONGO, District Judge.

William Hoopes, plaintiff in this civil rights action, was Chief of Police for the City of Chester from March 1977 to November 1978. He was demoted to the rank of inspector after testifying against former Chester Mayor John Nacrelli at Nacrelli's federal criminal trial on corruption charges. Hoopes is suing Nacrelli and the members of Chester City Council under 42 U.S.C. § 1983, on the ground that they fired him in retaliation for the exercise of his First Amendment rights of free association and free speech, and under 42 U.S.C. § 1985(2) on the ground that they conspired to intimidate Hoopes from testifying at Nacrelli's federal criminal trial.

Defendants now move for summary judgment,[1] and have submitted the affidavits of Nacrelli and members of Chester City Council. Hoopes has opposed the motion, filing an affidavit of his own along with numerous exhibits which he contends reflect the conspiracy.

### I. The First Amendment Claims

With respect to Hoopes' First Amendment claim, there is no question that his testimony at trial did constitute constitutionally protected speech. Hoopes also contends that his cooperation with federal investigators involved his right of free association. To justify Hoopes' demotion, defendants rely on the well-established principle that in certain circumstances an employee's public criticism of a superior, although otherwise protected, may be so injurious to the working relationship between the parties that dismissal is permissible because it is the only practical alternative.

Three cases are analogous to the instant case. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is the seminal case. In *Pickering*, a school teacher published a letter which sharply criticized members of the school board and the superintendent of schools. Certain statements in the letter were proven false. The teacher was dismissed. The Supreme Court held that the dismissal violated the teacher's First Amendment rights, but in doing so made clear that under certain circumstances such a dismissal would be proper. The Court emphasized that Pickering's letter was not directed against someone with whom he had to deal on a daily basis; that it did not impede his performance in the classroom or the functioning of the school; and that Pickering's job was not one of those "positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." 391 U.S. at 570, 88 S.Ct. at 1735. The Court noted that the standard to be applied in a situation where there was a close working relationship be-

---

1. In the summer of 1979, defendants moved to dismiss for failure to state a claim. In an opinion dated July 23, 1979, the motion was granted in part and denied in part. 473 F.Supp. 1214.

tween the parties would differ significantly from the standard which was applied in *Pickering*. *Id*.

The Third Circuit has employed the general principles set forth in *Pickering* in two cases. In *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), cert. denied, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), the court upheld the dismissal of a foreign language professor for having criticized the chairman of her department in private communications with colleagues and the dean. The court found two factors dispositive. First, since the communications were essentially private, and did not purport to inform or persuade a wide public audience on a public issue, the court ruled that they were entitled to less protection than those in *Pickering*. 520 F.2d at 1368. Second, the court noted that the district court, after holding an evidentiary hearing, found that as a result of Roseman's criticisms the harmonious relationship between faculty members was significantly disturbed.

In *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), the first assistant to the Philadelphia District Attorney, in a published interview, sharply disputed the truth of statements made by the District Attorney about a controversial sentencing recommendation. The interview sparked a public uproar about the integrity of the District Attorney, who then fired his first assistant. The court noted that the public importance of the first assistant's statements entitled him to a high degree of First Amendment protection. Nonetheless, it ruled that the controversy sparked by the interview was so disruptive of the working relationship between the two parties that dismissal of the assistant was justified, and it affirmed the district court's dismissal of the complaint for failure to state a claim on which relief could be granted.

In the instant case, Hoopes' statements are entitled to a high degree of First Amendment protection. Not only were they public statements relevant to an issue of general public concern, they were made while Hoopes was a witness at a federal criminal proceeding. Hoopes contends that because he was a witness, the *Pickering* standard and the *Sprague* standard are not directly controlling, and that the federal interest in protecting witnesses, as well as his right to cooperate with federal law enforcement officials, *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900), entitle him to protection notwithstanding the disruptive impact of his statements.

Hoopes is correct that this is not strictly a First Amendment case in the same sense that *Pickering* and its progeny were. There is a strong federal interest directly at issue not present in the *Pickering* line of cases—the protection of citizens who cooperate with federal law enforcement interests. This interest touches upon First Amendment issues, because a witness' testimony is certainly protected speech. But as this case demonstrates, the interest of both the government and the citizen who cooperates with it extend far beyond protecting a witness who gives testimony, because cooperation with law enforcement takes many forms. Here, Hoopes provided information to federal agents; withheld certain key information from Nacrelli; gave Nacrelli information fabricated by federal agents; and secretly taped conversations with Nacrelli. These actions, as much as his actual testimony, were the cause of his demotion.

Moreover, in a *Pickering*-type case, where no criminal wrongdoing is involved, there is somewhat less cause for concern in applying a rule which, in effect, immunizes the defendants from liability for a retaliatory discharge, and penalizes the plaintiff because he is in public employ. The courts have concluded that the public has an interest in the effective functioning of government which outweighs an individual public employee's interest in making public statements without fear of reprisal. In the instant case, however, where the allegation is that the plaintiff was harassed in the course of his cooperation with federal authorities, and finally demoted as a result of that cooperation, the balance of interests is different, and I am hesitant to conclude that

the *Pickering* principle should automatically allow the defendants to act with impunity.

Accordingly, I will assume that Hoopes intended to raise two sets of claims in his complaint: claims that he was demoted because of his exercise of First Amendment rights, and claims that he was demoted because of his cooperation with federal law enforcement authorities. I will evaluate Hoopes' First Amendment claims according to the traditional *Pickering* standard, without regard to the implications of his role in cooperating with federal law enforcement authorities, and will grant him leave to amend his complaint to state a claim for interference with the constitutional rights conferred by *Motes v. United States, supra,* 178 U.S. at 462–63, 20 S.Ct. at 994–95.[2]

Leave to amend "shall be freely given when justice so requires," Rule 15(a), F.R. Civ.P., and should be granted unless there are substantial reasons justifying its denial, such as bad faith, undue delay, dilatory motive or prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). An amendment may properly raise a claim not previously stated. *Kuhn v. Philadelphia Electric Co.*, 475 F.Supp. 324 (E.D.Pa.1979); *Prandini v. National Tea Co.*, 62 F.R.D. 503 (W.D. Pa.1974).

Here, the significance of Hoopes' cooperation with law enforcement authorities has been an issue in the case from its early stages, so this is not a case where the defendants can claim surprise at having an issue introduced late in the proceedings. Hoopes has not been dilatory in raising the significance of his participation in the federal investigation, but has attempted to incorporate this point into his First Amendment claims. In granting Hoopes leave to amend his complaint to state a claim under *Motes v. United States*, I am simply trying

to clarify the issues already raised in this suit.

When Hoopes' First Amendment claims are analyzed strictly as free speech claims, without regard to the implications of his status as a witness, it is plain that the Third Circuit cases relied upon by the defendants are applicable here. Hoopes' First Amendment claims are predicated upon his testimony at trial, and upon the communications he engaged in and associations he formed in connection with the federal investigation of Nacrelli. Hoopes' statements in meetings with Nacrelli himself during the course of the federal investigation are analogous to the private communications between the plaintiff professor and dean of the college which were at issue in *Roseman v. Indiana University, supra.* Similarly, although Hoopes made no public statements about Nacrelli during the course of the investigation, his testimony at Nacrelli's trial, in which he contradicted Nacrelli's version of events, is analogous to the public contradiction of the District Attorney by his first assistant at issue in *Sprague v. Fitzpatrick, supra.*

 Under the test formulated in *Sprague* and *Roseman*, a public employee may permissibly be discharged or demoted if (1) the working relationship between the parties is so close that certain forms of criticism of the superior would undermine the working relationship; and (2) the statements made had a disruptive impact on the working relationship. 546 F.2d at 564–65. Applying these criteria to the undisputed facts in this case, I conclude that the defendants are entitled to summary judgment on Hoopes' First Amendment claims.

 The parties agree that as mayor, Nacrelli had a statutory duty to oversee the

---

2. In *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900), the Court was asked to rule upon the validity of the Enforcement Act of 1870, now 18 U.S.C. § 241, which prohibits conspiracies to injure, oppress, threaten, or intimidate any citizen in the exercise of Constitutional rights. In upholding the power of Congress to enact the statute, the Court ruled that "[i]t was the right and privi-

lege of [an informant], in return for the protection he enjoyed under the Constitution and laws of the United States, to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws. That right and privilege may properly be said to be secured by the Constitution and laws of the United States." 178 U.S. at 462–63, 20 S.Ct. at 994–95.

operation of the police department, 53 Pa. Stat.Ann. § 37007. The parties also agree that although the day-to-day operations of the department were strictly Hoopes' responsibility, Nacrelli had ultimate power to fashion policy, approve procedures, hire and fire, promote or demote, and allocate personnel. *See generally* Article XX, Pennsylvania Third Class City Code, 53 Pa.Stat. Ann. §§ 37001–37009. The affidavits of the parties as well as Hoopes' testimony at trial reflect that there were numerous meetings between Hoopes and Nacrelli on matters of police policy, and Nacrelli plainly was interested in how limited police resources were deployed in the city.[3] On these facts, I am persuaded that the relationship between Hoopes and Nacrelli was sufficiently close and confidential in nature that it could not continue to function unless there was some modicum of trust between the parties.

The issue then is whether the various statements and actions by Hoopes had a disruptive impact upon his working relationship with the mayor. There was obvious tension between Hoopes and Nacrelli during the period of the investigation, as Nacrelli requested of Hoopes information relevant to the ongoing investigation which Hoopes believed he was forbidden to divulge. Hoopes and Nacrelli both retained legal counsel as their representatives in the dealings between them, and exchanged cautious letters. At trial, Hoopes gave testimony which contradicted Nacrelli, testifying that Nacrelli wanted him to keep ineffective officers on the vice squad; that Nacrelli wanted a particular officer removed from the vice squad; that Nacrelli wanted vice squad personnel diverted to racially troubled areas in Chester; that Nacrelli wanted officers transferred from the vice squad to form another platoon; and that Nacrelli reported to him an instance of an officer accepting a bribe, but waited five months before inquiring what steps Hoopes had taken against the officer. It was also revealed at trial that Hoopes taped conver-

sations with Nacrelli for the FBI, and that Hoopes withheld information because Nacrelli was a target of the federal investigation.

Hoopes' testimony made headlines in Chester. It is obvious that by the end of Nacrelli's trial, he no longer had confidence in Hoopes, and with good reason: in effect Hoopes had testified that Nacrelli was untruthful, and had revealed that he had secretly recorded private conversations with Nacrelli. Hoopes contends that notwithstanding the tension between the two men, police morale was high and the department continued functioning. He urges me to deny summary judgment because there is a factual issue regarding the impact of his cooperation and testimony on the police department.

Even assuming that Hoopes could produce evidence in support of his contention at trial, this evidence would not be material. As the Third Circuit noted in *Sprague*, "[t]he key question under *Pickering* . . . is whether the employment relationship has been seriously undermined." 546 F.2d at 566. Although Hoopes may have been able to continue running the police department, Nacrelli retained ultimate responsibility for it under the Third Class City Code, and it was necessary for Nacrelli to have a police chief in whom he had confidence. In *Sprague*, the court affirmed the district court's dismissal and appeared to conclude that it is simply a matter of common sense that a public official cannot function effectively when a subordinate has publicly questioned his veracity. *See* 546 F.2d at 565. Here, the strain on the relationship between the parties was that much greater because Hoopes had taped conversations with Nacrelli and intentionally supplied him with false information. It is completely unreasonable to suggest that an effective employment relationship could continue to exist under such circumstances, and I accept Nacrelli's contention that Hoopes' demotion

---

**3.** At one point in his affidavit Hoopes contends that there was little cause for him to meet with Nacrelli, and that Nacrelli as a rule would only consult him on traffic matters. This averment is refuted by Hoopes' own accounts of various meetings with Nacrelli, only some of which can be attributed to Nacrelli's attempt to seek information about the federal investigation.

was necessary if Nacrelli was to perform effectively his supervisory role over the police department. Therefore, Nacrelli's motion for summary judgment on the First Amendment claims will be granted.

The defendant members of city council are also entitled to summary judgment on the First Amendment claims. The council members did little more than to pass a resolution giving effect to Nacrelli's new appointment, and to the extent that Nacrelli's demotion of Hoopes is justified as necessary for Nacrelli to perform his duties, city council's cooperation with Nacrelli is also justified.

## II. *The Section 1985 Claims*

Hoopes also contends that the defendants violated 42 U.S.C. § 1985(2), which generally prohibits conspiracies to obstruct justice. The Third Circuit has held that § 1985(2) is comprised of two severable provisions, *Brawer v. Horowitz*, 535 F.2d 830, 840 (3d Cir. 1976), and it is the first segment of subsection (2) which is at issue in the instant case:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure any such party or witness in his person or his property on account of his having so attended or testified, ... (3) the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

Under this segment of § 1985, a party states a claim so long as he alleges a conspiracy to deter him from or retaliate against him for testifying in a court proceeding; there is no need to allege the existence of a class-based, invidiously discriminatory bias. 535 F.2d at 840.

Hoopes contends that the activities of Nacrelli and members of city council, in constantly requesting information from him about the pending federal investigation, in threatening him with sanctions for refusal to answer their inquiries, and in suggesting that he was not performing his job as chief, were designed to deter him from cooperating with federal officials and from testifying at trial. Many of these inquiries by the defendants could be construed as attempts to uncover the federal government's case against Nacrelli, and the defendants persisted in their inquiries even after Hoopes made clear that he might be liable for obstruction of justice if he were to answer.

Both Nacrelli and the council members aver in their affidavits that they were merely performing their duties as public officials in making these inquiries. This may well prove to be the case, but their liability turns upon their purpose in making the various inquiries of Hoopes, and this issue cannot be resolved on the basis of affidavits. The council members further argue that they had no authority to replace Hoopes, and therefore could not have intimidated him even if they wanted to do so, and that it was Nacrelli who made the decision to replace Hoopes. These arguments lack merit, because intimidation can take many forms, and the council members can be liable under § 1985 simply by virtue of having conspired to intimidate Hoopes, without regard to whether they had legal authority to replace him.

Defendants' motion to dismiss Hoopes' claim under § 1985 will be denied.