**Bertram N. PERRY, Plaintiff,**

v.

**Clarence THOMAS, Chairman of the Equal Employment Opportunity Commission (EEOC), James H. Troy and Charles H. Shanor, Defendants.**

No. CV88–H–270–S.

United States District Court,
N.D. Alabama, S.D.

July 5, 1988.

William F. Gardner, William K. Thomas, Wesley C. Redmond, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for Perry.

Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Asst. U.S. Atty., Bob Harwin and Richard D. Komer, Legal Counsel, David G. Liss, Asst. Legal Counsel, James M. Sober, E.E.O.C., Washington, D.C., for Thomas.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANCOCK, District Judge.

Under a date of November 10, 1987, Bertram N. Perry, who holds the position of Compliance Manager (Supervisory, Equal Opportunity Specialist—Enforcement Manager—GM-360-14) in the Birmingham District Office of EEOC, was given written notice from defendant James H. Troy, who is Director of Office of Programs Operations, of Perry's proposed discharge for cause. The notice contained eight stated "Reasons" for the discharge, some of which reasons embracing multiple specifications. The notice was amended February 5, 1988, to add one specification to an existing reason and to add two new reasons. The charges, as amended, if only partially true, more than justify the following opinion of Troy expressed in the November 10, 1987 letter:

> I have considered that you have no prior discipline of record. However, that fact does not serve to mitigate the seriousness of your misconduct. Your past work record has been considered above average. Your technical knowledge of compliance and investigatory work, under the laws entrusted to the Commission, is considered to be at a level commensurate with your length of service, grade and position. However, your demonstrated inability to effectively lead and manage human resources in the furtherance of this agency's mission outweighs your above average technical performance record and length of service. The Commission cannot tolerate your abusive attitude and open disdain for its employees and members of the public or cavalier approach to enforcement of the laws the Commission enforces.

\*   \*   \*   \*   \*   \*

> In considering the adequacy and effectiveness of an alternate sanction, it is my judgment that there is no viable alternative to your removal from the service. It is my firm belief that you do not possess the qualities to be a constructive manager and leader of the workforce. In fact, your racially and sexually derogatory remarks indicate that you would not make a desirable employee at any level of the workforce. For you to remain in Birmingham where you would continue to be a major antagonist and would prevent what could be a harmonious work environment would only serve to aggravate an already unbearable situation and would not promote the efficiency of the Service.

Plaintiff commenced this action on February 19, 1988, seeking to restrain and enjoin the implementation of the discharge described in the notices. In addition Perry seeks punitive damages from defendant Troy for his alleged wrongful conduct.

The complaint filed in this court seeks to pursue (1) a Title VII race and/or retaliation claim, (2) related claims under 42 U.S. C. §§ 1981, 1985 and 1986, and (3) a *"Bivens"* type claim predicated upon an alleged infringement of plaintiff's First Amendment right to free speech.

Immediately after receipt of an April 21, 1988 Notice of Final Decision by defendant Charles H. Shanor, General Counsel for EEOC, advising plaintiff of Shanor's decision (based upon the notices, affidavits submitted in support of the charges, oral and written responses by Perry, and affidavits and other documents submitted by Perry) to remove Perry from his "position and from the Federal service effective April 29, 1988," plaintiff filed his April 25, 1988 motion for a temporary restraining order and for a preliminary injunction. The request for temporary restraining order was heard April 26, 1988 and was denied as reflected in the April 27, 1988 Memorandum of Decision. In that decision the court reflected its views that (a) plaintiff's complaint failed to state claims upon which relief can be granted under §§ 1981, 1985 or 1986 and (b) this court does not have subject matter jurisdiction of the Title VII claims since Perry has failed to exhaust the administrative remedies afforded to him. The court does not perceive that the June 14, 1988 opinion of the United States Court of Appeals for the Eleventh Circuit expresses a different opinion or that plaintiff any longer is seriously seeking relief in this court under § 1981, § 1985, § 1986 or Title VII. Whether or not this perception is correct is relatively immaterial to the issue now before the court, as discussed hereafter.

Also in its April 27, 1988 Memorandum of Decision this court concluded that the complaint failed to state a claim for equitable or legal relief predicated upon Perry's assertion that the adverse employment action was in violation of his First Amendment right to free speech. Consequently, after obtaining from defendants a "voluntary" postponement until June 15, 1988 of the discharge so that Perry could promptly seek appellate review, this court denied the requested interlocutory injunctive relief. The court of appeals on June 14, 1988 vacated the "order on denial of injunctive relief on the First Amendment claim, with instructions to the District Court, in its consideration of the merits, to determine and to state on remand whether injunctive relief is required, based on traditional considerations." *Perry v. Thomas,* 849 F.2d 484 (11th Cir.1988). On June 15, 1988, during a second temporary restraining order hearing, defendants again "volunteered" to postpone implementation of the discharge until after a proposed preliminary injunction hearing on June 27, 1988 (and for a reasonable time thereafter for this court to render its decision). The request for a temporary restraining order was therefore denied; the motion for a preliminary injunction was heard on June 27–29, 1988; and the court now enters its findings of fact and conclusions of law.

In late March of *1987* the Washington office of EEOC received two anonymous letters purporting to be from employees in the Birmingham District Office complaining of abusive conduct by Perry. These letters were brought to the attention of defendant Troy who on April 1, 1987, requested the Washington EEOC Office of Audit immediately to initiate an investigation. The investigation produced a flood of verified evidence (a) that Bertram Perry over an extended period of time had treated numerous employees in the Birmingham District Office, including subordinates, in a grossly abusive and offensive manner and (b) that Bertram Perry time and time again had willfully disregarded basic sensitivities of human beings and the unique mission entrusted to EEOC. The twelve volume adverse action transcript upon which defendant Shanor concluded that Perry should be removed from his position and from the Federal service more than justifies his conclusion. Evidence presented to this court during the three-day hearing does nothing but underscore the correctness of that decision and causes one to wonder how conduct such as Perry's could be tolerated so long.

As indicated earlier, defendant Troy concluded that Perry did not "possess the qualities to be a constructive manager and

leader of the workforce" and that Perry's "racially and sexually derogatory remarks indicate" that he "would not make a desirable employee at any level of the workforce." This court fully agrees. The evidence supporting this conclusion is overwhelming. In front of employees in the Birmingham office, over an extended period of time, he frequently used phrases such as:

"EEOC is a nigger outfit—a welfare agency for blacks which is going downhill because it is operated by blacks"

"only lazy whites work at EEOC"

you are "a chicken-shit nigger"

"I won't let those white m-fs take my bread and meat"

he "wants to put this nigger (Perry) in his place".

"I always thought white females had only to lie at the foot of their master's bed."

He is "black and big lipped."

"You are stupid, dumb, thick-headed and incapable of learning."

Employees should "not act like niggers on the street."

"all the employees here are concerned with is who is busting who and standing on the corner playing with their penis while picking at the ladies walking by"

"I don't want to hear that shit, if you ass cannot make it I will get those cases and farm them out."

"stupid white bitch"

"that little white bitch thought she was slick"

the Equal Opportunity Specialists at Heritage Place are "more interested in moving what lies between their knees and their waistline than … in moving cases"

you are "dumb and stupid"

He "had better dye his (white) ass black."

"If I was screwing everyone I am accused of, I would have a dick this (indicating) long."

"Get off your fat ass and get him."

"he is a jigaboo"

I "had to use both hands to pull that poor white trash out of the can."

"that big, black son of a bitch"

"he cannot pour piss out of a boot"

"can you imagine being pistol-whipped with her tits"

"you need a pair of balls because you cry too much"

Often these phrases were addressed to a subordinate who was the object of his wrath and the statements were uttered in a loud, accosting voice.

Perry saved his most vicious verbal abuse for those who cooperated with the EEOC investigation of him or who refused to yield to his pressure to suppress the truth or to give false statements in his behalf. About these persons, Perry in substance said:

[the person] has been screwing someone who recently died of AIDS.

[the person] is a drunk.

[the person] threw the case I was interested in because of a dislike for me.

As I was completing my urinating process I saw his gleaming face with glazing eyes affixed either to my right hand or what was in it.

[the person] uses drugs.

They deal in drugs.

Little boys are locked in his office after work hours.

Drugs are bought and sold and used on the job by some privileged staff people who supply him with gossip and rumor.

He established a career ladder for her to pay her for her sexual favors accorded him.

Pressure was often applied to subordinates with admonitions like: you owe me blind allegiance; you are a snake—you ought to give me anything I want; I brought you here and I can take you away; it will get a little rough if you don't help me; and I'm going to come after you (for giving the affidavit).

While Perry holds most persons he deals with in low esteem, he has a very high opinion of himself. After the investigation was complete but before defendant Troy recommended adverse action, Perry came up for his annual job performance appraisal by his supervisor, District Director

George Frank Jordan. Perry went to the home of a subordinate employee on a Sunday and had her type from his handwritten notes [1] the following which, over the signature of Jordan, became a part of his rating for the period ending September 30, 1987:

Mr. Perry has maintained a remarkable level of communication between himself and all of the unit supervisors; though at least two of the six supervisors have frequently demonstrated beligerance to him regardless of the reasonableness of his requests for acceptable performance.

\*       \*       \*       \*       \*       \*

Mr. Perry's performance clearly demonstrates an outstanding comprehension of the complexity and difficulty of charges and cases assigned to the staff.

\*       \*       \*       \*       \*       \*

Mr. Perry's unique background in legal processes, plus his practical experience in compliance; coupled with his exceptional insight commands great respect from his associates who perform the legal functions. He is greatly respected by the legal units' management and assists in all ways available to him in the litigation program.

\*       \*       \*       \*       \*       \*

Mr. Perry is the most skillful trainer I have ever witnessed conduct training sessions. ... The personnel he has trained over the last year, and those persons he has trained in the past in all aspects of EEOC's processes, acclaim him as exceptional.

\*       \*       \*       \*       \*       \*

Mr. Perry requires the minimum amout of prompting and assistance in his work. His oral briefings and presentations are exceptional in clarity, persuasiveness and thoroughness. His written material comports with his oral presentations. He always conducts himself in a professional manner when he responds to calls or letters. ... He is compassionate, but is forthright in his deliberations.

These same views of self are reflected in an "anonymous" letter to Chairman Clarence Thomas from a "Concerned Employee" which Perry had a subordinate type at her home from his notes in early April of 1987, shortly after the investigation began:

We just finished a GAO investigation and today we are into another EEOC investigation because of unfounded charges made against Bertram Perry. For your information, the only reason this office has any semblance of operating is because Bertram Perry does his duties and attempts to see to it that members of the staff perform their duties in a professional way. ... Sometimes I am sorry I work here because I see that good work is not wanted, expected or appreciated. Bertram Perry not only is the compliance manager, he is supervising two units also. I heard he just put on an outstanding voluntary assistance program. It looks like you all would not do that man that way. Wrong is wrong. The word is that Jim Troy is using the union and union inspired incidents to make it look like Perry is the cause of the problems, he is out to get him, I hear.

█ But the correctness of Troy's opinion and of Shanor's decision and the presence of substantial, credible evidence justifying the adverse action are only tangential to the primary issue Perry has presented to this court. Perry asserts that the adverse employment action is directly related to an incident which occurred in March of *1986*, a year before the investigation was commenced. Perry claims that in total disregard for his First Amendment right of free speech, the investigation was commenced in March of *1987*, the adverse action was thereafter proposed in November of *1987* and the adverse decision was ren-

---

**1.** Perry testified that this did not occur, then testified that he did not recall it, and finally testified it did occur but that the notes were Jordan's notes. Perry's testimony in this regard, and in many other areas, is not credible or worthy of belief. Many witnesses, often at great personal risk (Perry kept secret files on employ-

ees and intimidated them with this activity) testified contrary to Perry's testimony; Perry's demeanor, particularly during cross-examination, suggested a lack of trustworthiness; there is little evidence which supports Perry's testimony; and there is substantial evidence to the contrary.

dered in April of *1988* because of a news release issued by him, and an interview conducted by him in his capacity as Public Affairs Officer for the Birmingham Office in March of *1986* in response to a public disclosure of a draft of a report of a Congressional subcommittee which accused the Birmingham Office (and several other EEOC offices in the country) of improperly closing cases to pad workload statistics. The news release and the newspaper stories reflecting the interview and the release are attached hereto as Exhibit A and are collectively referred to hereafter as the "speech." Perry asserts that his "speech" so outraged defendant Troy and other superiors in Washington that they began an ever broadening conspiracy to "muzzle" and to "get" Perry. The evidence simply does not support Perry's assertions.[2] While those responsible for initiating the investigation in March of 1987 and for recommending adverse action based thereon were aware of the 1986 "speech" and may well have not been happy therewith, the court is completely satisfied that Perry's "speech" was not a motivating or a determining factor in the decision to investigate or to take adverse action.

In reversing this court's earlier decision to dismiss plaintiff's First Amendment claim, the Court of Appeals instructed this court "to state on remand whether injunctive relief is required, based on traditional considerations." Injunctive relief is not only not required—injunctive relief is inappropriate. There is no likelihood that Perry can or should prevail on the merits of his request for a permanent injunction even though his "speech" was protected by the First Amendment because it was a comment on matters of public concern rather than matters only of a personal interest. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). While a strong argument can be made that since the "speech" was in his official capacity as Public Affairs Officer it loses its First Amendment protection, the court is of the opinion that it does not. But a determination that the "speech" was protected speech is not the end of the inquiry, for whatever interest Perry may have in commenting on these matters of public concern must give way to the interest of the federal government as an employer in promoting the efficiency of the public service which the government performs through its employees. *Pickering v. Board of Education,* 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968). The *Pickering* balance most often must tip in the government's favor when the speech is uttered in an official capacity as government spokesperson. "Neither *Pickering* nor its progeny contemplates that a public employee has the unfettered right to speak as the employee pleases." *Kotwica v. City of Tucson,* 801 F.2d 1182, 1184 (9th Cir.1986). Moreover, even if one were to conclude the *Pickering* balance tips in Perry's favor and further conclude that the "speech" did in fact trigger and was in fact a motivating or determining factor in the ultimate decision to take adverse action, any investigation spawned thereby produced such a variety of substantiated reasons for the immediate discharge from the public service of one who has so abused the privilege of that service that any such First Amendment rights must give way to the paramount public good. Simply stated, the same employment decision would have and should have been made in the absence of the "speech" element. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977). Thus, with regard to whether there is a substantial likelihood that plaintiff will prevail on the merits in this action in his effort to obtain permanent injunctive relief, the response is a firm and unequivocal no. There is no likelihood, much less a substantial likelihood, that he can prevail on his First Amendment claim.

---

**2.** In the adverse action file Perry also asserts the decision was racially motivated. He says that defendants Thomas and Troy are discriminating against him because of his light skin. Black witnesses at trial testified to Perry's prejudice against blacks with "very dark skin, big lips and big noses." While Perry accuses a wide variety of persons with having "racial problems," perhaps Perry should also evaluate himself. In any event, the General Counsel of EEOC concluded that Perry's claim of race discrimination was without merit. This court agrees.

Should it later be determined that the court is incorrect in its conclusion that there is no substantial likelihood of plaintiff prevailing on the merits, then the court is satisfied there is a substantial threat that plaintiff would suffer irreparable injury if interlocutory relief is not granted. Whenever a government impermissively infringes upon a First Amendment right there is irreparable injury. But does any such threatened injury to Perry outweigh the threatened harm an injunction may do to defendants? The court is satisfied that not only the Birmingham District of the EEOC but the entire EEOC operation will be significantly and adversely affected even by an order so sterile as requiring Perry to be kept on the payroll, without assignment, pending a determination by the Merit System Protection Board of any appeal Perry might pursue following his discharge. The abused employees in the Birmingham District Office are equally as deserving of consideration in the balancing process by this court as is Perry. Furthermore, the granting of a preliminary injunction would disserve the public interest. Seldom does it disserve the public interest to preserve the status quo while a federal employee redresses an adverse employment decision improperly motivated by an improper abridgment of the employee's First Amendment rights. As earlier noted, there has been no such abridgment. But even if there had been an improper abridgment, here it has been so well documented and established that the one who seeks equity from this court has not done equity to his fellow workers that the public interest would not be served by the requested injunction.

■ For the reasons herein expressed, the court will by separate order deny plaintiff's motion for a preliminary injunction. And since the Civil Service Reform Act of 1978 provides to plaintiff a fully adequate remedy to redress the adverse employment action with which he takes issue, including the First Amendment aspects associated therewith, the order will also dismiss plaintiff's claim for permanent injunctive relief predicated upon his First Amendment claims. While the earlier order of this court entered April 27, 1988 disposed of all other claims and in effect was not disturbed by the June 14, 1988 appellate court opinion, the order to be entered will also dismiss all other claims for the reasons given April 27, 1988 in the event it is perceived that they are still pending in this court.

### FINAL ORDER

In accordance with the Memorandum of Decision this day entered, it is hereby

ORDERED, ADJUDGED and DECREED that the June 14, 1988 motion of plaintiff for interlocutory injunctive relief is DENIED and all claims herein are DISMISSED but such dismissal is expressly without prejudice to plaintiff's rights of review to the Merit System Protection Board under the Civil Service Reform Act of 1978. Costs are taxed against plaintiff.

### EXHIBIT A

United States Equal Employment Opportunity Commission Birmingham District Office

NEWS RELEASE

March 26, 1986

Contact Person:

BERTRAM PERRY, Public Affairs Officer,

2121 8th Ave. N. Suite 824

Phone: (205) 731 1166
### FOR IMMEDIATE RELEASE

(This News Release is in response to an article which appeared in the Morning Edition of the Birmingham Post–Herald on March 26, 1986. The article was entitled "EEOC RUSHED CASES THROUGH", and in substance indicated that a draft summary of the House Education and Labor Committee Report states that the EEOC "prematurely closed cases to pad workload statistics and violated the law by arbitrarily dropping the use of goals and timetables.")

Assuming the article in the Morning Edition of the Birmingham Post–Herald of this date is reasonably accurate as to the content of the House Education and Labor Committee Report, the Commission's Birmingham District Office find the conclusions reached, therein, (especially as they relate to this office) to be inaccurate, narrow, shortsighted, and, perhaps, more indicative of differing political views than of factual determinations for the following reasons.

First of all, the only "congressional staffers" to visit the Commission's Birmingham District Office were staff members from the office of Congressman Augustus Hawkins (D–Calif.). Obviously, no republican congresspersons were represented on the team or present to review the information or make independent assessments of the "reported facts" ostensibly gathered by Congressman Hawkins' staff members. Unfortunately, none of the three persons on Congressman Hawkins' team reviewed a single case file in order to examine the nature and extent of any investigation which had been conducted with respect to any given charge. This was so, notwithstanding the fact that all of the Commission's records pertaining to over 2000 cases which had been processed during fiscal year 1985 were made available to them.

What the staffers did do was to talk to as many disgruntled Commission employees as possible, apparently, in order to obtain information which could serve as political ammunition in the Congressman's continuing battle with the Reagan Administration over the operation of the EEOC, itself.

Secondly, the report is regrettable because it denigrates the recent concerted effort by the Commission and its Birmingham District Office to process charges expeditiously without sacrificing the rights of either the charging parties who may have suffered a wrong, or the employers who at some expense of time and money must respond to the charge. As a matter of fact the Commission has attempted to reach more charging parties than ever before through its "Expanded Presence Program," which involves the placement of Commission representatives in rural and other outlying areas for greater accessibility. Similarly, the Commission has attempted to inform and cooperate with more employers through its "Voluntary Assistance Program," which includes seminars and symposiums for personnel managers and officials. These programs have drawn great praise from the general public. Thus, far from trying to "pad" its statistics the Commission has attempted to weed out baseless, unsupported charges while at the same time concentrating on those which have merit by ensuring that such are processed to the fullest extent. This has been evidenced by the record number of lawsuits which have been filed on behalf of individual charging parties during the past fiscal year.

While we are not in a position to comment about the references to other EEOC offices, (although we suspect they are also flawed) the Committee's Report as it pertains to the Birmingham District Office, lacks credibility because of the review team's failure to examine, first-hand, the investigative files, themselves. The staffer's reliance upon the statements of disgruntled federal employees, who have been prodded to do their work on a timely basis for the benefit of charging parties, employers, and the general public, is misplaced and should not be the basis for congressional criticism.

### Birmingham Post–Herald, Wednesday, March 26, 1986

#### EEOC rushed cases through

#### Enforcement goals ignored, panel says

##### From Staff and Press Reports

After visiting Birmingham and several other cities, a congressional committee has reported that the Equal Employment Opportunity Commission prematurely closed cases to pad workload statistics and violated the law by arbitrarily dropping use of goals and timetables.

The report, obtained yesterday, also blamed commission policies for reducing the number of discrimination victims receiving compensation and cutting down the

number of settlements reached with employers.

"There is an increasingly greater emphasis on the rapid closure of cases at the expense of quality investigations," said the draft summary of the House Education and Labor Committee report.

"Moreover, attempts have been made to 'pad' the number of charges processed in order to present better case processing statistics and to make some district offices look good."

In the Birmingham office, the report said, "It was stated that there was a wholesale closure of cases at the end of fiscal year 1985, ostensibly in order to 'pad' the workload statistics and to show that the district office had processed an impressive number of charges that year."

Officials of Birmingham's Equal Employment Opportunity Commission office could not be reached for comment last night.

Debbie Graham, spokeswoman for the national agency, which was established to protect workers against job discrimination, denied all the allegations.

The report was written after committee staff visited EEOC offices in Birmingham, New York City, St. Louis, Chicago, Houston, and Los Angeles.

Investigators found some equal employment specialists in those offices "are compelled, under threat of a low performance rating, to prematurely close an investigation rather than miss a supervisor-imposed deadline or to have a charge in the inventory longer than 300 days," the report said.

"As a result, some meritorious charges may be unjustifiably closed and given a 'no cause,' because the investigation of the charge was incomplete."

The report said the Administrative Procedure Act was violated when the commission's acting general counsel, Johnny J. Butler, orally directed the legal staff last October not to seek enforcement of goals and timetables for women and minorities.

Another policy change, which limits remedies to "identified victims" of discrimination instead of an entire class, has drastically slashed the number of people receiving compensation, the report said.

"In the first half of 1985, only 2,964 victims of discrimination received monetary benefits through charges filed with the agency," the study said "In 1980, 15,328 persons received such benefits."

According to the report, some EEOC officials believe their discretion to reach settlements before trial has been reduced by a new policy that lists five specific remedies that the commission should seek for victims.

"One possible effect of the new remedies policy may be the diminution of the number of conciliations (settlements) attained," the report said. "For example, in fiscal year 1982, settlements accounted for 29.4 percent of all case closures, in fiscal year 1985, only 14.4 percent of the charges processed were settled."

---

### EEOC denies House charges of padding data

Allegations that the Birmingham District office of the U.S. Equal Employment Opportunity Commission may have padded statistical reports and closed discrimination cases prematurely are untrue, an official of the local office said Friday.

The Birmingham office was one of several EEOC offices named in a draft congressional House committee report revealed last week that said the EEOC prematurely closed cases to pad workload statistics. The report also claims that the EEOC, the federal agency established to protect workers against job discrimination, has violated the Administrative Procedure Act by not enforcing federal goals and timetables for women and minorities.

The Birmingham office was one of several EEOC offices visited by staff of the U.S. House of Representatives' Education and Labor Committee, which prepared the report for the committee. Committee staff also visited EEOC offices in New York City, St. Louis, Chicago, Houston and Los Angeles.

Bertram N. Perry, compliance officer for the Birmingham District Office, said three

committee staff members came to Birmingham last December but did not ask to see individual case files at the local office, although more than 2,000 cases that had been processed in 1985 were made available to them.

Based on the type and manner of questions asked, Perry said, he was not surprised after reading published reports of the draft report. He said he believes the matter may be politically motivated at a high level "at which we at this office are not involved."

A prepared statement released by the Birmingham EEOC office, in response to news accounts of the committee report, said the House staff members talked to "as many disgruntled commission employees as possible, apparently, in order to obtain information which could serve as political ammunition." The statement termed the investigation as a "continuing battle" between the House committee's chairman, U.S. Rep. Augustus Hawkins, D-Calif., and the Reagan Administration over the operation of the EEOC.

The Associated Press obtained the House report last Tuesday. The report says that at the Birmingham office, "there was a wholesale closure of cases at the end of fiscal year 1985, ostensibly in order to "pad" the workload statistics and to show that the district office had processed an impressive number of charges that year."

Perry denied that, and said some of the active cases in the office are several years old, and that a number of outstanding cases were carried over into the current fiscal year.

Several employees working under Perry said Friday the Birmingham office frowns on employees taking shortcuts to rush cases through. They said they have never been encouraged to close cases without legitimate reasons.

The latest EEOC audit report of the Birmingham office, issued in August 1985, Perry said, gave the office a "glowing" evaluation report, saying "the quality of case processing is outstanding in every respect."

Perry said the Birmingham office had a backlog of 5,000 cases in 1979, but that many of those cases were resolved under a system set up by then EEOC Chairwoman Eleanor Holmes Norton so that a nationwide backlog of cases could be handled more quickly.

Perry said the local office opened 1,921 new cases in 1981 and closed 3,502 cases. In 1984, 2,455 were opened and 2,079 closed, and in 1985, 2,023 were opened and 2,735 closed.

---

Birmingham Post-Herald, Friday, March 28, 1986

## Local EEOC denies it has closed cases to help statistics

### By Peter Leyden

#### Post-Herald Reporter

Local Equal Employment Opportunity Commission officials yesterday vigorously disputed a recent preliminary congressional report that the Birmingham office was one of several EEOC offices that prematurely closed cases to pad workload statistics.

Bertram Perry, who supervises the investigation of all local cases, said the congressional staffers who visited the office in December did not look at any individual cases but relied on gossip from employees.

"That's what hurt me—that these staffers would take gossip," he said in his office. "These staffers relied a lot on a group of disgruntled employees."

Moreover, Perry said, staff members from the Democrat-controlled House Education and Labor Committee who drafted the report had political motives for condemning the quality of work.

Gus Hawkins, a California Democrat who heads the committee, has been critical of the Reagan administration's revamping of the EEOC. Some critics have accused the Reagan administration of cutting back on efforts to correct racial discrimination in the workplace.

"They came to get crap, and that's what they got because that's what they wanted," Perry said.

A draft copy of the report was leaked to the press several days ago after staffers visited EEOC offices in Birmingham, New York City, St. Louis, Chicago, Los Angeles and Houston, Texas.

According to The Associated Press, the report stated, "There is an increasingly greater emphasis on the rapid closure of cases at the expense of quality investigations.

"Moreover, attempts have been made to 'pad' the number of charges processed in order to present better case processing statistics and to make some district offices look good."

In the Birmingham office, the report said, "it was stated that there was a wholesale closure of cases at the end of fiscal year 1985, ostensibly in order to 'pad' the workload statistics and to show that the district office had processed an impressive number of charges that year."

Committee members and EEOC officials in Washington have not yet seen the report and would not comment yesterday.

Perry said the changes to speed the processing of cases began under the Carter administration, after case backlogs had clogged the system. In 1979 the Birmingham office had 5,000 backlogged cases, he said.

He said caseworkers must aim for general quotas and must try to finish a case in less than 300 days. He said they now emphasize bringing employer and employee together and settling cases before they become entangled in lengthy legal proceedings.

"That's the only way to get the case out of here—or else we would be here 20 years working on 20 cases.

"Justice delayed is justice denied," he said.

Perry denied dumping cases or padding statistics, although he said that, like most offices, year-end deadlines tend to make more work get done.

According to local statistics, the local office opened 1,921 new cases in 1981 and closed 3,502. In 1984, 2,455 were opened and 2,079 closed; in 1985, 2,023 were opened and 2,735 closed.

Perry said the two staffers spent only two days in Birmingham and interviewed some of the 90 caseworkers. He said some might have complained about management pressure to do more work.

Perry, a Republican who has worked in the office for 20 years, defended the Reagan administration's handling of the office.

"The Reagan administration hasn't done anything more detrimental than any other administration that I've seen."