985 F.2d 559
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lora BRYANT, Jr., Plaintiff-Appellant,
v.
James HARRIS, James Enix, and Joseph Brennan, Defendants-Appellees.
 No. 92-3189.
 United States Court of Appeals, Sixth Circuit.
 Feb. 2, 1993.
 
 Before RALPH B. GUY, JR. and BATCHELDER, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant, Lora Bryant, Jr., appeals the district court's award of summary judgment to defendants-appellees, James Harris, James Enix, and Joseph Brennan, all employees of the Ohio Department of Industrial Relations ("ODIR"), on the basis of qualified immunity. We affirm.
 
 I.
 
 2
 Plaintiff-appellant Bryant, who is black, began employment with ODIR in June of 1984. Since 1984, he has been Assistant Chief of the Pressure Piping Division ("Division") of ODIR, an Ohio state agency. At all times relevant to this action, Harris was the Director of ODIR, Brennan the Deputy Director, and Enix the Chief of the Division. The Division, which is responsible for the inspection of all pressure piping installations in Ohio, has 23 employees, including 17 inspectors. The inspectors are responsible for ensuring that qualified individuals properly install pressure piping. Pressure piping is used most frequently in institutions such as schools and hospitals. Improper installation can result in explosions. As Assistant Chief of the Division, Bryant is responsible for supervising inspectors, providing technical assistance to inspectors and the public, assisting inspectors out in the field and investigating complaints, preparing evaluation reports on inspectors, and acting as the liaison between ODIR and the public.
 
 
 3
 In early 1988, based on information provided to Bryant by other ODIR employees, Bryant began to believe that non-union pipe installers were receiving less favorable treatment than union pipe installers relative to inspections of pressure piping, thus leading to selective enforcement of the law ("selective enforcement") by ODIR. Bryant and his attorney at the time, Spencer Youell, contacted Carolyn Lukensmeyer, the Chief of Staff to the Governor, regarding selective enforcement and other issues of concern to Bryant. The Governor's Office conducted an investigation. At the conclusion of this investigation, the Governor's Office issued a memorandum stating, among other things, that the facts did not substantiate Bryant's belief regarding selective enforcement. However, Harris was directed to conduct an intra-departmental evaluation to determine if selective enforcement existed within ODIR.
 
 
 4
 On June 9, 1988, Harris assigned the investigation to John Brant. Brant was a member of the Advisory Board of Building Standards. Brant had not been appointed to this position by Harris and did not report to Harris. During the course of Brant's investigation, pursuant to Harris's instructions, Brant interviewed four individuals and investigated allegations of selective enforcement at five facilities in Ohio. Brant also conducted other interviews and followed up leads that developed during the investigation. On June 20, 1988, Brant submitted his report to Harris. In his report, Brant concluded that there was "no evidence" that selective enforcement had occurred and that "almost every allegation" by Bryant involved "disagreement about managerial and policy decisions." On June 27, 1988, Lukensmeyer received a copy of Brant's report.
 
 
 5
 At an administrative proceeding that took place in 1991, Lukensmeyer testified that in early July of 1988, she had telephoned Bryant's attorney, Youell, and told him the results of the investigation. She further testified that at a later meeting attended by Bryant, Harris, and Youell, Bryant assured her that the issues he had raised earlier, including selective enforcement, had been taken care of. At the same administrative proceeding, however, Bryant denied ever having made this statement. In an affidavit dated October 29, 1991, Attorney Youell averred that he did not recall having been informed by Lukensmeyer of the results of the investigation or having received a copy of the report. Youell also averred that he possessed no notes indicating that such a conversation with Lukensmeyer had taken place.
 
 
 6
 In June or July of 1988, Bryant asked Brant for a copy of the ODIR investigative report. Brant refused to give Bryant a copy and instructed him to see Harris about obtaining a copy. Bryant never asked Harris for a copy of the report, nor did he ever discuss the report with Harris. Bryant alleges that although he was informed by Harris that Harris's door was always open, he was never able to get in to see Harris.
 
 
 7
 Harris also testified at the administrative proceeding. His testimony was that because Lukensmeyer told him Bryant had been informed of the results of the investigation, Harris believed it was unnecessary to provide Bryant with a copy of the report. Harris also testified that he never discussed the report with Bryant because Bryant never asked him to.
 
 
 8
 Bryant, however, alleges that he did not learn the results of the investigation until much later. At his deposition, Bryant testified that when Brant refused to give him a copy of the report, Bryant believed that the results of the investigation had been covered up. Bryant also testified that he believed it was his responsibility to ensure that a proper investigation was made. To this end, Bryant contacted a number of state senators and representatives, including former State Representative Don Gilmore. With the assistance of Representative Gilmore, Bryant was interviewed by Station WBNS, a Columbus television station. On May 21, 1990, approximately two years after Brant had issued his report, this interview was aired on the 6:00 p.m. and 11:00 p.m. WBNS news programs. During the interview, Bryant stated that Harris had covered up the results of the selective enforcement investigation.
 
 
 9
 On June 20, 1990, Bryant was informed by the personnel director of ODIR that disciplinary action was being considered against him because of his statement concerning a cover-up. On June 28, 1990, a pre-disciplinary hearing was held. Bryant and his attorney were present at that hearing. On August 2, 1990, Harris sent Bryant a letter notifying Bryant that he would be suspended for ten days. The letter stated, in part, that "[t]he statements made on May 21, 1990 in regards to a cover up of the investigation on selective enforcement were untrue and false statements."[1]
 
 
 10
 Bryant initially sought review of the suspension decision in the State Personnel Board of Review and the Ohio Court of Claims. On September 25, 1990, he brought the present action, based on 42 U.S.C. §§ 1981, 1983, and 1985(3), in United States District Court for the Southern District of Ohio. Bryant alleged violations of his First Amendment right of free speech, his Fourteenth Amendment right to equal protection of the laws, and certain rights under state law. On November 4, 1991, defendants moved for summary judgment. On January 30, 1992, the district court granted summary judgment to all defendants on the federal claims on qualified immunity grounds.[2]
 
 
 11
 In granting summary judgment, the district court relied on Pickering v. Board of Educ., 391 U.S. 563 (1968), and this court's decision in Gossman v. Allen, 950 F.2d 338 (6th Cir.1991), which the district court found to be directly on point. The court also concluded that even if Bryant's assertion that he had not been informed of the results of the investigation or received a copy of the report were true, a reasonable official could have believed that Bryant made false statements knowingly or recklessly. Therefore, all defendants were entitled to qualified immunity as a matter of law on the First Amendment claim. The court also granted summary judgment on Bryant's other claims. In this timely appeal, Bryant raises only the First Amendment claim.
 
 II.
 
 12
 Qualified immunity may be invoked by a government official as a defense to suit if that official's conduct "does not violate clearly established federal 'statutory or constitutional rights of which a reasonable person would have known.' " Gossman, 950 F.2d at 341 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). If " 'officers of reasonable competence could disagree' on whether the conduct violated the plaintiff's rights," immunity attaches. Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). See also Caldwell v. Woodford Cty. Chief Jailer, James Moore, 968 F.2d 595, 599 (6th Cir.1992). Qualified immunity is available as a defense to a claim brought under § 1983 and alleging a First Amendment violation. Id.
 
 
 13
 Public employees generally have a First Amendment right to comment publicly on matters of public concern. Pickering, 391 U.S. at 563. However, employees do not have a First Amendment right: 1) where false statements are knowingly or recklessly made by an employee; or 2) where, weighing the right of an employee to comment against the interest of the employer in efficiently providing services to the public, the balance tips in favor of the employer. Id. at 568, 574; see Gossman, 950 F.2d at 342.
 
 
 14
 For purposes of summary judgment on the basis of qualified immunity, the inquiry is not whether the plaintiff actually made false statements knowingly or recklessly,[3] but whether a reasonable official could believe he had done so. Gossman, 950 F.2d at 342. Because the standard is based on a reasonable official, a particular official's subjective intent ordinarily is not relevant. Poe v. Haydon, 853 F.2d 418, 430 (6th Cir.1988), cert. denied, 488 U.S. 1007 (1989). "Resolution of qualified immunity is purely a question of law for the district court." Id. at 424.
 
 
 15
 In Gossman, the plaintiff was terminated from her position with the Louisville and Jefferson County Board of Health. Prior to her termination, she had been involved in a dispute with her supervisor over enforcement priorities. While employed by the Board of Health, Gossman wrote letters to federal and state officials, urging investigation of the Waste Water Treatment Program. She also made public statements regarding alleged favoritism and cover-ups in the Program, wrote articles under a pseudonym and attributed quotations in the articles to "Gossman," and filed, in a federal enforcement action, an affidavit that accused her supervisor of unfair treatment of a local waste water treatment plant.
 
 
 16
 Gossman was terminated. According to the Board of Health Director, she was terminated because her affidavit contained misrepresentations and half-truths, thus "undermining public confidence, causing internal discord, and impairing the Board's ability to carry out its duties." 950 F.2d at 340. Gossman sued, alleging a First Amendment violation, as well as violations of state law. In her deposition, Gossman gave testimony that contradicted a number of her allegations concerning favoritism and cover-ups. We concluded that "a reasonable official could believe that Gossman had knowingly or recklessly made false statements to the media and to the court," id. at 343, and that defendants, therefore, were entitled to qualified immunity.
 
 
 17
 Bryant relies on Poe v. Haydon. In Poe, the defendants allegedly, because of "gender-based animus," failed to investigate or remedy sexual harassment of the plaintiff. 853 F.2d at 432. We noted in that case that "[a]lthough Harlow and its progeny eschewed inquiry into a defendant official's subjective intent, ..." id. at 430, "a government official's motive or intent in carrying out challenged conduct must be considered in the qualified immunity analysis, where unlawful motive or intent is a critical element of the substantive claim." Id. at 431. Bryant alleges that as in Poe, questions regarding the defendants' motivation in the present case preclude summary judgment. However, we find our reasoning in Gossman to be applicable here:
 
 
 18
 Unlike Poe, there is no disputed question ... involving the defendants' motivations.... The defendants admit that [Bryant] was fired because of [his] statement[ ] to the public.... Therefore, we need only examine the purely legal question of whether reasonable officials could have disagreed over whether the First Amendment would bar terminating [Bryant] for [his] statement[ ].
 
 
 19
 Gossman, 950 F.2d at 342.
 
 
 20
 Bryant acknowledges that the qualified immunity analysis set forth in Gossman controls here. He also concedes in his brief that "solely as a result of the content of [his] statement, Bryant was suspended for ten days." (Appellant's Brief at 10). Thus, the issue is not whether defendants suspended Bryant for a reason other than the content of his statement. Rather, the issue is whether a reasonable official in defendants' position could have believed that Bryant knowingly or recklessly made a false statement.
 
 
 21
 We conclude that reasonable officials in defendants' positions could have believed that Bryant knowingly or recklessly made a false statement when he alleged a cover-up of the results of the selective enforcement investigation. Carolyn Lukensmeyer testified, at the earlier administrative proceeding, that she had informed Bryant's attorney of the results of the investigation. She also testified that Youell was satisfied with the results and even complimented her on the report. Lukensmeyer further testified that at an October 23, 1988, meeting, Bryant himself told her that all the original issues he had raised, including selective enforcement, had been taken care of. Harris was present at this meeting, and so would have been aware that Bryant had expressed his satisfaction with the results of the selective enforcement investigation. In response, Bryant denies that, at the October 23, 1988, meeting, he indicated that the selective enforcement issue had been taken care of.[4]
 
 
 22
 There exists a factual dispute concerning whether defendants reasonably could have believed that, when he made his statement on television, Bryant had actual knowledge of the results of the selective enforcement investigation. However, there is no dispute that in the nearly two years between the time the report was issued and the time that Bryant made his public statement, he never asked Lukensmeyer, Harris (to whom he had been referred by Brant), or even his own attorney for a copy of the report. Bryant also conceded, at his deposition, that he based his cover-up theory on the fact that Brant refused to provide him with a copy of the report:
 
 
 23
 Q: You asked Mr. Brant for a copy of the report. And from that you jumped to the conclusion that Mr. Harris covered it up, covered the investigation up; is that correct?
 
 
 24
 A: That's my contention. I asked for a copy of the report. I did not get it.[5]
 
 
 25
 For purposes of summary judgment on the qualified immunity issue, we accept Bryant's position, that he was not informed of the results of the investigation and never expressed to Lukensmeyer or Harris his satisfaction with the resolution of this issue. However, it is undisputed that over the course of almost two years, Bryant did not ask anyone besides Brant for a copy of the report or make a credible effort to discover details of the investigation before appearing on television. Given these facts, a reasonable official could have believed that Bryant was reckless in alleging that a cover-up had occurred.[6] Therefore, as the district court correctly reasoned, summary judgment for the defendants on the basis of qualified immunity was proper.
 
 III.
 
 26
 The judgment of the district court is affirmed.
 
 
 
 [1]
 The letter also informed Bryant that no selective enforcement had been found; that Bryant had waited for two years after the investigations before making a public statement; and that he had been informed of the results of the two investigations by Lukensmeyer and ODIR
 
 
 [2]
 The district court, in an earlier decision, had held that Bryant's state-law claim for intentional infliction of emotional distress was barred by Ohio statutory immunity
 
 
 [3]
 Recklessness connotes "serious doubts as to the truth of [the] publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). See also J. Nowak, R. Rotunda, & J. Young, Constitutional Law § 16.33(b), at 928 (West 3d ed. 1986)
 
 
 [4]
 Bryant also maintains that the Affidavit of Youell indicates that Youell was never notified of the results of the investigation or given a copy of the report. However, in his Affidavit, Youell only avers that he does not recall having received the results of the investigation or a copy of the report and possesses no notes indicating that such a conversation had taken place
 
 
 [5]
 Bryant also testified, at his deposition, that based on what Brant had told him, he did not believe that Brant's report "went far enough."
 
 
 [6]
 Only one allegedly false statement is involved here, rather than a number of false statements, as in Gossman. However, the number of false statements is not dispositive. Under the circumstances of this case, a reasonable official could believe that a false statement was knowingly or recklessly made. Therefore, qualified immunity is available to defendants