LESIAK, APPELLANT, *v.* FERGUSON, STATE AUDITOR, ET AL., APPELLEES.

(No. 44596—Decided November 10, 1982.)

*Mr. Crede Calhoun,* for appellant.

*Mr. William J. Brown,* attorney general, and *Mr. B. Douglas Anderson,* for appellees.

JACKSON, J. Appellant, Donald Lesiak, was dismissed from his job with the office of the State Auditor after sending a letter and granting an interview to a newspaper concerning the events which led the city of Cleveland to default on its obligations. The State Personnel Board of Review upheld his dismissal, and he appealed to the court of common pleas pursuant to R.C. 119.12. The court of common pleas affirmed the decision of the board of review, and the appellant has appealed to this court, assigning three errors for review.[1]

Part I of this opinion sets forth the factors to be considered in balancing the interests of the appellant, his former employer the State Auditor, and the public. In Part II the evidence of appellant's violation of the Auditor's "press policy" is set forth. In Part III, the law is applied to the facts.

I.   First Amendment Considerations
     Appellant's main contention is that

---

[1] Assignment of Error No. 1

"The judgment of the trial court violates the rights of the public and of the appellant under the First Amendment of the United States Constitution guarantying [*sic*] freedom of speech."

Assignment of Error No. 2

"The judgment of the trial court was not supported by evidence or by reliable, probative and substantial evidence, and was against the manifest weight of the evidence."

Assignment of Error No. 3.

"The hearing officer and the trial court committed error in preventing a full cross-examination of the Auditor and his witnesses on relevant subjects."

The appellant's third assignment of error, involving an evidentiary matter, is summarily overruled, because it is not "specifically pointed out in the record and separately argued by brief." App. R. 12(A). The first two assignments of error are argued in the appellant's brief, and are disposed of on the merits.

the Auditor's decision to terminate his employment was in violation of the First Amendment to the United States Constitution, guaranteeing freedom of speech to all persons.

The leading case on this subject is *Pickering* v. *Board of Education* (1968), 391 U.S. 563. Pickering was a teacher in Will County, Illinois, who was dismissed for writing a letter to the editor of his local newspaper criticizing the board of education for allocating more money for athletics, and less for education, than Pickering thought appropriate. His termination was upheld by the Illinois courts, but the Supreme Court reversed, finding his dismissal to have been in violation of the United States Constitution.

The court recognized that both the public employee and the public employer have interests which must be protected. The majority held that:

"The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568.

In the case of public school teachers, the Supreme Court held that:

"* * * absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574-575 (footnote omitted).

The court indicated in *Pickering*, however, that each case would have to be decided in view of the facts and circumstances which are present. The court noted, in footnote 3 of its opinion, that:

"It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases."

The factors to be considered in evaluating the constitutionality of the appellant's termination include the following:

(1) the public importance of the information imparted by appellant;

(2) the truth or falsity of the statements made by appellant, and his knowledge of their truth or falsity;

(3) the existence of a policy of confidentiality at the time of these events, and the justification for such a policy; and

(4) the degree (if any) to which appellant's ability to efficiently perform his duties has been impaired by reason of his disclosures.

The fourth of these considerations does *not* condone the termination of a public employee who "blows the whistle," because the employee has raised the ire of those who are the subject of his disclosures. As the Supreme Court noted in *Pickering*:

"* * * the only way in which the [School] Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were *per se* detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. Certainly an accusation that too much money is being spent on athletics by the administrators of the school system * * * cannot reasonably be regarded as *per se* detrimental to the district's schools. Such an accusation reflects rather a difference of opinion between Pickering and

the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." 391 U.S. at 571.

In the case at bar, the courts are required to determine whether appellant's disclosures sufficiently redounded to the public interest so as to justify his violation of his employer's policy of confidentiality.

II. Evidence of Appellant's Violation of Auditor's "Press Policy"

There is no dispute that the State Auditor's office had an unwritten policy against communication by employees with the media about past or present audits,[2] and appellant admitted that he was aware of this policy. There is also no dispute that appellant wrote a fifty-six page letter to the publisher of the Plain Dealer, and gave a three-hour interview on that subject to a reporter for that newspaper. What is disputed is the necessity for the policy of confidentiality, and the nature of the information disclosed by appellant.

A. Justification for Policy of Confidentiality

Thomas Ferguson, State Auditor, in his testimony before a hearing officer of the State Personnel Board of Review, described the "press policy" of the auditor's office in the following words:

"Well, basically the Auditor of State's office has had a policy as far as public relations and audits are concerned of only have [sic] the public relations department speak to any audits that are released by the Auditor of State's office. It is against our regulations for any individual in the office to talk about an audit in progress or a completed audit."

Ferguson admitted that the "press policy" remained unwritten until after appellant had been terminated, but stated that all employees were aware of the

policy. Ferguson testified that he had, on one previous occasion, instructed a Cleveland employee to remind appellant of the "press policy." The justification for the policy of confidentiality was described by Ferguson as follows:

"Q. Could you tell the Hearing Officer, please, why the policy is in effect?

"A. Well, basically we think it's very necessary. For example, and I think there are two distinct areas here in the policy, and those areas deal with an audit in progress and a completed audit.

"With an audit in progress it — again, it would be totally unprofessional for anyone to speak about an audit in progress to the media or to anyone other than the individuals directly involved in that audit.

"As far as a completed audit is concerned, here again once an audit is completed, and by that I mean not completed in the field but completed in the office and is actually issued, and we don't consider that a public document until the audit is actually released or issued. Up until that time it is not a public document, but once it is issued it is a public document. Here again we felt it was necessary to insulate our auditors in the field from being faced with, with making statements or criticisms of officials that, they have to go back in and reaudit or do audits on.

"And so, again, part of this policy was really to protect them and their professional standing. And, again, to let the public relations department handle any inquiries that would come on these audits.

"* * *

"* * * it would be totally unprofessional to talk about an audit in progress or to speak about an audit before that audit is released.

"You could damage a reputation. There are many times that audits, because of the legal, change in, changes in law, court decisions, that those — the audits are changed by the legal department to conform to the present law. And therefore, you know, it would be very

---

[2] This policy was reduced to writing and included in a manual for employees of the Auditor's office after the appellant was terminated.

possible that, that what was spoke [sic] about in a post-audit conference, that there would be things that would not be in the final audit or it may change form in the final audit.

"And, therefore, if you were to speak about what happened as you were progressing along in the audit, there might be accusations made that would not be true. There could be all kind of misstatements, really."

Ferguson distinguished disclosure of information about a pending audit from disclosure of information about a completed audit, finding the former to be a far more serious violation of the unwritten "press policy":

"Q. Do you consider there to be a distinction betwen a discussion of a completed audit and a pending audit?

"A. Oh, big distinction. Yeah.

"Q. Would you explain that to the Hearing Officer.

"A. Well, again, it's — as I've been pointing out, I feel, you know, you really don't discuss a pending audit, period, with anybody but those individuals involved. And by that meaning, I would mean the auditors or the people that you're auditing. You just don't discuss a pending audit.

"Now, again, once an audit is public, that audit — or is released, that audit is a public document. And, of course, the document speaks for itself as to what it contains. The criticisms it contains, or what criticisms might be there in the work papers or any place else.

"Again, you know, as far as an examiner talking about a, a [sic] audit when it is released I would consider that, of course, a breach of policy. But if only that were involved, I would probably, as I did before with Mr. Lesiak, give him a reprimand or warn him or maybe, at the most, give him a suspension.

"Q. For discussing the completed audit?

"A. For discussing a completed audit, yes."

According to State Auditor Ferguson, public disclosure regarding pending audits is prohibited because premature publicity might erroneously damage the reputation of an auditee, before the State Auditor's office had determined whether a violation had occurred. Disclosure of information relating to completed audits is prohibited solely to protect examiners from being questioned about public officials whom they may have to audit in the future.

Both of the justifications of the "press policy" offered by the Auditor are constitutionally permissible; but, in a proper case, an employee of the Auditor's office might be justified in violating the "press policy" in order to bring to public attention a matter of consequence, and in such a case, it would be constitutionally impermissible for the Auditor to discipline the employee. We are also persuaded that the Auditor's policy of confidentiality is far more pertinent to pending audits than to completed audits.

B. Nature of Information Disclosed by Appellant

Appellant Donald Lesiak contends that he contacted the press in order to dispel the impression that he had performed his job poorly as examiner-in-charge of auditing financial records of the city of Cleveland from 1976 through 1978. Appellant was reassigned from "examiner-in-charge" of the city of Cleveland to "resident examiner" at Cleveland State University on January 15, 1979, one month after the city went into default. This reassignment, which might reasonably be considered a demotion, was announced in a press release by the State Auditor on January 15, and in a newspaper article appearing in the Plain Dealer on the same day. Appellant's replacement in Cleveland, William F. Hart, gave an interview describing the city's books as "unauditable," and promising to make them "auditable." Hart stated that the city's most serious problem was that it had been using bond money to meet the

general payroll, and that "the city should have been cited for it before."

Four months later, in May 1979, appellant sent a fifty-six page letter to the publisher of the Plain Dealer, setting forth in great detail every action he took to stem the improper and illegal financial and accounting activities of public officials of the city of Cleveland. Although most of this letter involves completed audits (and points out that the media failed to publish the findings of those audits), some information was disclosed regarding pending audits. At page four of the letter, Lesiak indicated that during one post-audit conference with Mayor Kucinich in 1978, that he had discussed violations by Mayor Perk between 1973 and 1976, and that they had discussed the use of a computerized accounting system. At pages 19 to 20 of the letter, Lesiak described how at the last four or five post-audit conferences that he had with Mayor Kucinich that he instructed city officials that the monthly computer printouts they received from the Division of Accounts were in error. According to Lesiak, only one municipal department made a positive response to his suggestion; the rest performed "limited and intermittent or nonexistent" reconciliation of accounts.

The main thrust of Lesiak's letter was that neither city officials nor state auditors had listened to him through the years as he warned them of the city's impending financial crisis. The letter rebukes the State Auditor's office for failing to give his office the necessary personnel to perform its function, and for failing to take action against the city of Cleveland for its many flagrantly illegal fiscal practices.

In short, the appellant's letter, though verbose, contains little information about pending audits. The appellant's interview with a Plain Dealer reporter, however, is a different matter. During this interview appellant freely discussed pending audits of municipal agencies, and singled out individuals who might be found responsible for misuse of city funds. At one point, appellant told the reporter that he planned to assess the Clerk of the City Council $122,000 in a "Finding for Recovery," on account of what appellant had considered to be illegal contracts. He released this information even though he knew that the legal department of the State Auditor's office had not yet reviewed this matter. In fact, appellant's only knowledge of this violation was from a draft report prepared by one of his assistants, which had recommended that the $122,000 constituted "payments contrary to statute" and not a "finding for recovery."[3] Appellant explained that he intended to change the recommendation to a finding for recovery before transmitting the audit to the State Auditor's office.

Appellant also told the newspaper reporter that he was going to cite Mayor Kucinich for obstruction of a state audit, and that there might be a finding of recovery against a member of the civil service commission whom he named, whose salary was excessively high. Appellant admitted that he spoke about these two audits, and about audits of the Cleveland Personnel Department and Law Department, before these audits had even been reviewed by the State Auditor's office in Columbus. It therefore appears that appellant's interview with the newspaper reporter contained several serious breaches of the policy of confidentiality with respect to pending, incompleted audits.

---

[3] As the trial court noted:

"A finding for recovery is extremely significant because it indicates an illegal or unauthorized expenditure such as embezzlement, forgery, overpayment, or misappropriation of public funds. Proper documentation is always required before a finding of recovery is issued by the Auditor of State's Office; suppositions or approximations are insufficient."

### III. Constitutionality of Appellant's Termination

Public disclosure of official wrongdoing is in the greatest public interest. However, employees of investigative bodies may do more harm than good when they make premature allegations of wrongdoing during the course of an investigation.

In the case at bar, appellant's disclosures of information regarding alleged wrongdoings by Mayor Kucinich, the Clerk of Council, and the member of the civil service commission, prior to review of these audits by the State Auditor's office, could have unfairly tarnished the reputation of these individuals.

The public interest is served where conscientious members of watchdog agencies "blow the whistle," if their agency deliberately or inadvertently fails to perform its duty. However, in the case at bar, appellant went beyond "blowing the whistle," and unnecessarily disclosed sensitive information concerning several pending audits. There is no indication in the record that the State Auditor's office hindered or intended to cover up appellant's investigation of the individuals involved.

While it is certainly possible that the State Auditor terminated appellant because of appellant's criticism of the Auditor's performance, the appellant provided his employer sufficient cause for his termination by disclosing information about uncompleted audits to the Plain Dealer reporter. In the case at bar, the public interest is best served by permitting the State Auditor to terminate appellant's employment.

Accordingly, the decision of the trial court is affirmed.

*Judgment affirmed.*

CELEBREZZE, P.J., concurs.

MARKUS, J., concurs in judgment only.