FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8: 49

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JAMES M. CRAVEN, | No. 42955-1-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF EMPLOYMENT SECURITY, | UNPUBLISHED OPINION |
| Respondent. | |

QUINN-BRINTNALL, J. — After meting out progressive levels of discipline for past misconduct, Clark College (College) suspended Professor James Craven for two academic quarters for his frequent and repeated use of College resources to send unprofessional, harassing, and offensive e-mails to other faculty members at the College. During his period of suspension, Craven applied for and received unemployment benefits from the Washington State Employment Security Department (ESD). The College appealed the benefit award and following a hearing, an administrative law judge (ALJ) ruled that Craven's misconduct rendered him ineligible to receive unemployment benefits, thereby requiring that he repay the benefits he had already received. Former RCW 50.20.190 (2007); RCW 50.20.066; RCW 50.04.294(1)(b). Craven appealed, and the ESD Commissioner confirmed the ALJ's decision. Craven, appearing pro se, now appeals the commissioner's decision. Because substantial evidence supports the

commissioner's factual findings and Craven deliberately violated standards of behavior and use of school resources that the College had the right to require of its employees, we affirm.[1]

## FACTS

### BACKGROUND

The College suspended Craven, a tenured economics professor, for two academic quarters (108 days) in 2010 after concluding that Craven violated school policy on multiple occasions by using school resources to send unprofessional and offensive e-mails to colleagues.[2] Although all of the incidences precipitating the disciplinary action involved valid professional concerns—the election of a new division chair to replace Craven when Craven was on extended medical leave, the denial of tenure for another faculty member, and intra-union faculty concerns—Craven offended a number of his colleagues with the bellicose and offensive ways in which he expressed his concerns. And although some of these communications occurred in electronic forums not monitored by the College, offended faculty members brought the communications to the College's attention.

On February 6, 2009, Craven wrote an e-mail to five College faculty members, including Professor Adnan Hamideh who had recently replaced Craven as the division chair of their academic division. Craven explained that he deeply resented being replaced as chair while on medical leave and stated that Hamideh was not fit to hold the job, "not even close."

---

[1] Craven's briefs fall well below the standards envisioned by RAP 10.3 as he fails to cite *any* legal authority for his arguments. Nevertheless, it is clear that Craven challenges the commissioner's decision denying him unemployment benefits, a decision ESD agrees is properly before us.

[2] The College had disciplined Craven multiple times (with increasing severity) in the past for similar policy violations.

Administrative Record (AR) at 497. Two days later, in another e-mail sent to the same group, Craven stated that Hamideh did "not even qualify as an amateur in this job" and that "you will never in your life know the economics I know." AR at 496. In April, Craven sent another message addressed to Hamideh (sent also to six others) entitled, "This is What REAL Division Chairs and 'Educators' Do," stating, in part,

> Please notice date sent and my status/title on that date. There is no question whatsoever as to when my Division Chair term started and is to end. Thus those who continue to deny it are liars, and those who continue to act upon what they themselves have called known lies and misrepresentations are what? What would you call such persons? Fit to be called "colleagues", "educators", "leaders" – of anything? And for any kind of educators to be undermining their own contracts and seniority rights, as well as the rights of students to the best qualified teachers we have available and for whom they signed up reminds me of *those Palestinians covertly working in the occupied territories building illegal settlements on the historical lands of their families for invading settlers.*

AR at 503 (emphasis added).

Hamideh reported this last e-mail to the College administration, explaining that "as [Craven] well knows, the Palestinian issue is deeply rooted in my soul, being and culture. To compare me to the sell outs and culprits is far too big of an insult to swallow realizing that as he knows, from our talks in the past, this is one of the biggest insults that anyone from my cultural background can take." AR at 502.

In a separate incident from March involving the denial of tenure for some faculty members, Craven sent an e-mail to his union's entire faculty and adjunct e-mail distribution lists.[3] This e-mail stated, in part,

> Well I sleep well at night because they know that I will never back down, I cannot be schmoozed, bullied, co-opted, bought or taken out without a fight and I have tried to call the warning about abuses of human and employee rights over and

---

[3] The Association of Higher Education is the faculty union at Clark College.

over. . . . I have no doubt that in the case of the Journalism teacher, it was certain articles in The Independent that led to her not getting tenure. For the life of me I cannot figure what *Professor "Chemical Ali"* (who was told to ignore all my emails when he first came here) could have done. But *just as in the case of Nazi Germany, you can also add, to the list of those responsible for these abuses, all those faculty and staff who are spineless, two-faced and opportunistic and willing to trade away their own rights and those of others to protect their sweet gigs, little turfs and programs, etc.*

AR at 505 (emphasis added).

Although Professor Ali Aliabadi—referred to by Craven as "Chemical Ali"—was initially upset with being compared to "a notorious mass murderer of Kurds," Aliabadi did not formally complain to administration after Craven apologized. AR at 504. However, other faculty members did make the administration aware of the offensive e-mail.

Last, on April 27, Craven sent an e-mail to the same faculty list-serve groups discussing a faculty petition of support for their union representative, Marcia Roi. Craven entitled the e-mail "High Noon" and stated, in part,

Gerry Smith dropped in with a petition to support Marcia Roi and said he could not make the Board meeting would I drop it off. . . . So why only 41 then 42 names on [the petition]? Here, I believe we have the "High Noon" phenomenon/metaphor [of] the "townspeople" who very quietly, covertly and in some cases spinelessly and opportunistically, cheered on the Sheriff while covertly making alliances and playing it safe with the invading thugs. . . . I was genuinely worried that not having more names would further undercut Marcia whose own guts, despite our differences, I respect as much as I have contempt for the spineless and petit-bourgeois, especially the ones that talk and sound so "radical" -- the lowest of the low.

. . . .

This happened before with [other initiatives] that threatened cutbacks and layoffs initially. Union membership went up, the entrepreneural [sic] types jockyed [sic] for close proximity and face-time with the administrators, supposed friends betrayed supposed friends, and *GI Joe's [sic] did a booming business on kneepads and chapstick.*

AR at 511 (emphasis added). Professor David Reed was offended by this e-mail and reported it to College administration.

Because Craven was on medical leave in the spring and then he and the College administration were unable to meet during the summer, a hearing concerning potential discipline related to these e-mails did not occur until November 20, 2009. Following this hearing, at which Craven was represented by union counsel, the College notified Craven of his pending 108-day suspension.

PROCEDURE

Following his suspension, Craven applied for unemployment benefits. Although the benefits were initially granted on the grounds that "the delay between the discovery of the incident and the imposition of [Craven's] suspension [was] longer than reasonably expected of a serious offense,"[4] the College appealed the benefits determination. AR at 301. A hearing before an ALJ occurred on June 28, 2010.

Both parties presented witness testimony at the hearing and extensive documentary evidence. Additionally, the College submitted its faculty and computing policies as part of the administrative record. The College argued that all of Craven's above-cited e-mails violated the College's policies and procedures. For instance, article VI A.4 of the College's policies states that when a faculty member "speaks or writes as a citizen, he or she should be free from institutional censorship or discipline" but that "[a]s a person of learning and an educational officer, he or she should remember that the public may judge the profession and the institution by his or her utterances." AR at 600. Accordingly, faculty members "should at all times be accurate, exercise appropriate restraint, [and] show respect for the opinions of others." AR at 600.

---

[4] The record indicates that at the time of this initial determination, ESD was unaware of why such a long delay occurred between the misconduct and the suspension.

In addition, article VI A.5 states that "[a]ll members of the College community are to be treated with respect and with sensitivity to the impact of words and opinions." AR at 600. Finally, the College's "Faculty Job Description" states that faculty members must "[d]emonstrate respect for others," and "[e]ffectively use computer applications for instruction and communication where appropriate." AR at 600. Craven never denied authorship of the e-mails and mostly argued about due process, the First Amendment, and conspiracies perpetrated by the College—issues not properly before the ALJ.[5]

Following the hearing, the ALJ issued an initial order reversing ESD's benefit determination. The order explained that the only "issue in the appeal is whether [Craven] was suspended from employment for deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee as defined in RCW 50.04.294(1)(b)." AR at 864. The ALJ's factual findings pointed out that Craven had previously been disciplined for similar incidences of misconduct, including an eight-day suspension for "inappropriate behavior through e-mail that was threatening, intimidating, retaliatory and created a hostile work environment." AR at 865. The ALJ also found that despite Craven's assertions that he was not

---

[5] The ALJ repeatedly attempted to explain to Craven the limited scope of review. *See, e.g.,* AR at 106 ("[W]hat I am dealing with is whether or not misconduct has been shown by what you did. And if it's a matter of the judges have judged you at the school, having some biased, still comes back to whether or not I agree with their decision, the fact that what you did was misconduct."). While it is true that "the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest,'" *Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Board of Education of Township High School District 205, Will County, Illinois,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)), *cert. denied,* 130 S. Ct. 1047 (2010), the only question before the ALJ—and this court—is whether ESD erred in denying Craven unemployment benefits. If Craven seeks to vindicate a claim related to violation of his First Amendment rights, rather than his right to unemployment compensation, he must bring the First Amendment claim in the appropriate forum.

given sufficient opportunity to respond to the College's proposed disciplinary action, Craven "did get sufficient and appropriate chances to respond to the disciplinary action prior to its imposition." AR at 868.

And in his conclusions of law, the ALJ explained that

> [t]he rude comments, innuendos, sexual reference, and derogatory analogies used by the claimant through the e-mails giving rise to his suspension [were] totally inappropriate. The claimant had been repeatedly warned of using this type of language and approach to voice his complaints over whatever issue he was upset about. . . . It is held that the claimant's actions were willful and inappropriate under the overall rules of both the college policies and the union contract. It is held his actions were harmful to the College. It is held that the claimant was suspended for misconduct under RCW 50.04.294(1)(b) and RCW 50.20.066.

AR at 868.

Craven appealed this decision to the ESD Commissioner. After reviewing the entire record before the ALJ, the commissioner adopted the ALJ's findings of fact and conclusions of law. The commissioner concluded that Craven "was afforded a full and fair opportunity to present his case before the Office of Administrative Hearings" and that ultimately Craven's "discharge precipitating conduct has been shown, by a preponderance of substantial and credible evidence of record, to have been in deliberate violation or disregard of standards of behavior which an employer has the right to expect of an employee." AR at 882. Craven now appeals this decision.[6]

---

[6] Craven also appealed, unsuccessfully, to Thurston County Superior Court. Because this court sits "in the same position as the superior court," reviews "the decision of the Commissioner, not the underlying decision of the ALJ," and applies "the [Administrative Procedure Act (APA), ch. 34.05 RCW,] standards directly to the administrative record," discussion of the superior court ruling is unnecessary. *Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 32, 226 P.3d 263 (2010).

DISCUSSION

DISQUALIFYING MISCONDUCT

Craven asserts that his e-mail exchanges to other faculty members at the College did not constitute misconduct disqualifying him from receiving unemployment benefits for the duration of his suspension. ESD argues that Craven engaged in disqualifying misconduct and was properly disqualified from receiving unemployment benefits while suspended. Specifically, ESD contends that Craven's e-mails constituted conduct that "willfully disregarded his employer's interests and deliberately disregarded his employer's standards of behavior" and, accordingly, the commissioner did not err in denying benefits. Br. of Resp't at 13. We agree. Because substantial evidence supports the commissioner's findings of fact and Craven's violation of the College's reasonable policies constituted misconduct, we affirm the commissioner.

A.    STANDARD OF REVIEW

The Washington Administrative Procedure Act (APA), ch. 34.05 RCW, governs judicial review of a final decision by the ESD Commissioner. *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). We sit in the same position as the superior court, apply the APA standards directly to the administrative record, and review the decision of the commissioner, not the underlying decision of the ALJ. *Verizon*, 164 Wn.2d at 915 (citing *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 405-06, 858 P.2d 494 (1993)). We treat the commissioner's decision as being prima facie correct and the "burden of demonstrating the invalidity of agency action is on the party asserting invalidity," here Craven. RCW 34.05.570(1)(a); *Anderson v. Emp't Sec. Dep't*, 135 Wn. App. 887, 893, 146 P.3d 475 (2006). But we will reverse the commissioner's decision if that decision is based on an error of law, if

substantial evidence does not support the decision, or if the decision is arbitrary or capricious. RCW 34.05.570(3)(d), (e), (i).

We review questions of law de novo, giving substantial weight to an agency's interpretation of the statutes it administers. *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988). We review findings of fact for substantial evidence in light of the whole record. RCW 34.05.570(3)(e); *Lee's Drywall Co., Inc. v. Dep't of Labor & Indus.*, 141 Wn. App. 859, 864, 173 P.3d 934 (2007). Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

The determination of whether an employee has committed misconduct is a mixed question of law and fact in that it requires the application of legal precepts (defining misconduct) to factual circumstances (the circumstances surrounding the disciplinary action). *Tapper*, 122 Wn.2d at 402. As our Supreme Court explained in *Tapper*,

> Analytically, resolving a mixed question of law and fact requires establishing the relevant facts, determining the applicable law, and then applying that law to the facts. The characterization of "misconduct" as a mixed question of law and fact does not mean that we are free to substitute our judgment for that of the agency as to the facts; instead, the factual findings of the agency are entitled to the same level of deference which would be accorded under any other circumstance. *See Franklin Cy. [Sheriff's Office v. Sellers]*, 97 Wn.2d [317,] 329-30[, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983)]. The process of applying the law to the facts, however, is a question of law and is subject to de novo review. *Henson [v. Emp't Sec. Dep't]*, 113 Wn.2d [374,] 377, 779 P.2d 715 [(1989)]; *Johnson v. Dep't of Emp't Sec.*, 112 Wn.2d 172, 175, 769 P.2d 305 (1989). The findings of fact made by the agency below are therefore critical to our resolution of the question of whether [the defendant] engaged in misconduct connected with her work.

122 Wn.2d at 403. Accordingly, we must initially determine whether substantial evidence supports the commissioner's factual findings and, if so, whether these facts constitute disqualifying misconduct under the Employment Security Act, Title 50 RCW.

B.    FACTUAL FINDINGS

Craven does not deny authoring *any* of the e-mails in question or that the College previously disciplined him for prior inappropriate behavior, including inappropriate e-mail exchanges. Accordingly, substantial evidence supports the commissioner's findings[7] relaying the content of the inappropriate e-mails described above and, further, the finding that "[b]efore the incidences giving rise to his suspension, prior disciplinary actions were taken against [Craven] based on similar factors giving rise to the suspension in this case."[8] AR at 864.

C.    DISQUALIFYING MISCONDUCT

Whether the commissioner's factual findings support its conclusion that Craven's actions constituted misconduct disqualifying him from receiving unemployment benefits during his suspension is a legal issue we review de novo. *Haney v. Emp't Sec. Dep't*, 96 Wn. App. 129, 138-39, 978 P.2d 543 (1999).

The Washington Legislature enacted the Employment Security Act to provide benefits to individuals who are "involuntarily" unemployed "through no fault of their own." RCW

---

[7] The findings are technically the ALJ's findings explicitly adopted by the commissioner.

[8] Craven's brief appears to challenge finding of fact 10—that he was given "sufficient and appropriate chances to respond to the disciplinary action prior to its imposition," AR at 868—by frequently asserting that he was denied due process prior to the suspension occurring. Although a government employee who possesses a constitutionally protected property interest in his or her employment is entitled to a predeprivation opportunity to be heard pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542-45, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), Craven has failed to adequately brief this issue or explain why the hearing he received in this instance, a hearing at which he had legal representation, was legally inadequate. Accordingly, we do not address his bald assertion. RAP 10.3(a)(6).

50.01.010. Accordingly, "where any fault of unemployment lies with the claimant, the claimant is disqualified from receipt of unemployment benefits." *Cowles Pub. Co. v. Emp't Sec. Dep't*, 15 Wn. App. 590, 595, 550 P.2d 712 (1976), *review denied*, 88 Wn.2d 1001 (1977). The Act specifies that when a claimant "has been discharged or suspended for misconduct connected with his or her work," he or she is disqualified from benefits, RCW 50.20.066(1), and that disqualifying "misconduct" includes "[d]eliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee." RCW 50.04.294(1)(b). The Act provides a number of examples of per se disqualifying misconduct, including "[v]iolation of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule." RCW 50.04.294(2)(f).

Here, Craven engaged in disqualifying misconduct by disregarding his employer's reasonable policies to ensure a nonhostile work environment—policies he was well aware of having been disciplined on multiple occasions in the past for having violated them—concerning treating colleagues in a respectful manner. The College's rules are reasonable since they relate to employee job duties and are a normal business requirement. *See* WAC 192-150-210(4) ("A company rule is reasonable if it is related to your job duties, [or] it is a normal business requirement or practice for your occupation or industry."). Moreover, Craven's e-mails clearly fall beyond the pale of acceptable workplace communications. While an isolated error in judgment is understandable, Craven's inappropriate conduct was pervasive and recurring: Craven analogized his colleagues' behavior to that of Nazi sympathizers, implied that a Palestinian colleague (Hamideh) was the type of person who would betray his own country, off-handedly referenced a mass murderer in naming another colleague (Aliabadi), referred to fellow staff as "spineless, two-faced, and opportunistic," AR at 505, and employed inappropriate sexual

11

innuendo, referencing "kneepads and chapstick." AR at 511. These comments clearly evince a complete disregard for the College's reasonable policies concerning inappropriate work place behavior. It is not unreasonable for an employer to expect a certain level of civility from its employees.

Craven flouted the College's reasonable company rules concerning employee decorum and appropriate use of e-mail. On appeal, Craven had the "burden of demonstrating the invalidity of agency action." RCW 34.05.570(1)(a). Having refrained from arguing why the College's policies are unreasonable or that he did not violate these reasonable policies, Craven fails to meet this burden. Accordingly, we hold that the commissioner did not err in ruling that Craven's actions constituted misconduct disqualifying him from receiving unemployment benefits while suspended. Further, to the extent Craven received benefits in error, he was not entitled to those benefits and is liable for repayment pursuant to RCW 50.20.066(5): "All benefits that are paid in error . . . are recoverable."

OTHER ISSUES

Although Craven raises issues related to union contracts, civil and criminal conspiracy, judicial misconduct, employer harassment, and the First Amendment, none of these issues are appropriately before this court or properly briefed. Pro se litigants, like Craven, are held to the same standard as attorneys and must comply with all procedural rules on appeal. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993). Accordingly, we refrain from addressing them. RAP 10.3(a)(6). *See also Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Craven also requests attorney fees. Attorney fees, however, are not available on appeal to a nonlawyer, pro se litigant. *In re Marriage of Brown*, 159 Wn. App. 931, 938, 247 P.3d 466 (2011). Moreover, Craven has not prevailed in this appeal.

12

No. 42955-1-II

Because substantial evidence supports the commissioner's factual findings and Craven deliberately violated standards of behavior the College had the right to expect of its employees, we affirm the commissioner's decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J.

We concur:

JOHANSON, A.C.J.

BJORGEN, J.

13